Douglas MANN and Michael Dubis, Co–Receivers, and Paliafito America, Inc., an Illinois corporation, Plaintiffs,

v.

HANIL BANK, Korea Exchange Bank, Cho Hung Bank, Commercial Bank of Korea, Ltd., Industrial Bank of Korea, Min Suk Han, J.R. Kang, M.Y. Park, Seung Suk Han, Sin Won Kang, Yoon Soo Han, Tae–Young Suh, Jang–Seok Han, and Se–Myeong Yoo, Defendants.

No. 94–C–1165.

United States District Court, E.D. Wisconsin.

March 13, 1996.

**946**

Peter C. Blain, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, for Co–Receivers.

David E. Springer and John K. Lyons, Skadden, Arps, Slate, Meagher & Flom, Chicago, Illinois, for Paliafito America, Inc.

Charles R. McKirdy, Rudnick & Wolfe, Chicago, IL, and Clay R. Williams, Thomas R. Streifender, and Ken A. Hoogstra, Gibbs, Roper, Loots & Williams, S.C., Milwaukee, WI, for Defendants.

## DECISION AND ORDER

WARREN, Senior District Judge.

Now before the Court is the Motion for Partial Summary Judgment on Count I of the Complaint filed by plaintiffs Douglas Mann, Michael Dubis, and Paliafito America, Inc.[1] The plaintiffs seek an order avoiding certain financial transfers made by Longreen Toys, Inc. ("Longreen") to defendants Hanil Bank, Korea Exchange Bank, Cho Chung Bank, Commercial Bank of Korea, Ltd., and Industrial Bank of Korea (collectively the "Korean banks") on the ground that these transfers were fraudulent. For the following reasons, the plaintiffs' motion will be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

The above-captioned action is ancillary to the Paliafito litigation long before this Court. On February 19, 1993 and April 7, 1993, this Court issued preliminary writs of attachment freezing the assets of certain entities affiliated with Miryoung ("Joy") Lee and her company, MAI, Inc. (hereinafter referred to collectively as the "Mantae defendants"). On August 19, 1993, *nunc pro tunc* to August 13, 1993, this Court entered judgment in favor of Paliafito and against the Mantae defendants in the amount of $8 million as a result of these defendants' failure to comply with the Court's prior writs. *See Select Creations, Inc. v. Paliafito America, Inc.,* ("Select I"), 830 F.Supp. 1223 (E.D.Wis.1993).

---

1. Also before the Court are various motions filed by each party relating to the briefing of the instant motion.

The defendants have filed a motion to strike certain portions of the declarations submitted in support of the plaintiffs' motion on the basis that they contain inadmissible hearsay. The Court concludes that the plaintiffs' supporting material is either admissible for the purposes offered or immaterial to this motion. *See* Fed.R.Evid. 801, 803. Accordingly, the defendants' motion to strike is hereby denied.

Each of the parties has also filed various motions for leave to file briefs in excess of the page limit specified by the local rules and for leave to file additional responsive briefs. These motions are hereby granted; the Court will consider all the material submitted in connection with the plaintiffs' motion for partial summary judgment.

In an attempt to avoid this default judgment, Joy Lee caused MAI Inc. to file a Chapter 11 bankruptcy petition on February 22, 1993. *Select Creations, Inc. v. Paliafito America, Inc.,* ("Select II"), 852 F.Supp. 740, 747 (E.D.Wis.1994). At the behest of the bankruptcy court, an auction was held to sell MAI's assets. *Id.* at 757. Longreen was incorporated by individuals connected with Paliafito defendant MJ Korea for the purpose of surreptitiously purchasing these MAI assets at the auction. *Id.* at 757–59. Longreen was the high bidder at the MAI auction. *Id.* at 760. Paliafito believed that the purchase of MAI assets by any entity connected with the Mantae defendants violated this Court's earlier writs; upon its discovery of the Longreen–MJ Korea connection, Paliafito filed an Emergency Motion for Entry of a Second Supplemental Writ of Attachment, requesting that the Court appoint a receiver to take custody of assets purchased at the MAI auction and enjoin the Han respondents from selling Grip Toys products. *Id.* at 762. On February 25, 1994, the Court entered a preliminary order which, *inter alia,* restricted the purposes for which MJ Korea, Longreen, and MHW Inc. (collectively "the Mantae transferees") could transfer funds out of the United States. On May 10, 1994, this Court entered partial judgment in the amount of $8 million in favor of Paliafito and against the Mantae transferees. *See Select II,* 852 F.Supp. 740.

As a result of these and other decisions and orders, the Paliafito litigation now stands, for the most part, in a judgment collection posture. To assist in the collection of the $8 million default judgment, the Court appointed Douglas Mann and Michael Dubis to serve as Co–Receivers under the Writ of Execution, Permanent Injunction, and Appointment of a Receiver to Perform Additional Duties. *See* Writ of Execution of May 31, 1994. The Writ of Execution imposed a general freeze on all assets legally or beneficially owned by the Mantae defendants and the Mantae transferees. Specifically, Paragraph 20 of the Writ provides as follows:

> The Mantae defendants, the Mantae transferees, Yang Ok Han, and any of their officers, directors, attorneys, employees, agents, parent corporations, subsidiary corporations, shareholders, or affiliates, and any person or entity in active concert or participation with them who receives actual notice of this Writ by personal service or otherwise, are hereby permanently enjoined:

> (a) from selling or otherwise transferring any asset owned, legally or beneficially, by the Mantae defendants or the Mantae transferees, including, without limitation, Gripball Games, Grip Football games, Scatch, Hit N Grip Games, any other Grip toy product or accessory, inventories, accounts receivable, bank accounts, marketable securities, currency, certificates of deposit, checks and other negotiable instruments and for any purpose, including the payment of attorneys' fees;

> \* \* \* \* \* \*

> (g) from failing to turn over to the Co–Receivers all assets owned, legally or beneficially, by the Mantae defendants or the Mantae transferees wherever located. . . .

Pursuant to their duties under the May 31st Writ of Execution, the Co–Receivers commenced this lawsuit against several Korean banks and individuals seeking, *inter alia,* an order (1) avoiding numerous transfers of funds made by Longreen to the defendant banks as fraudulent (Count I of the Complaint), and either (2) compelling the defendant banks to "liquidate the [real estate] collateral" located in South Korea which "was part of the equity investment of the owners of MJ Korea, defendants Min Suk Han and the Han Relatives, and constitutes an asset of MJ Korea properly subject to execution," and "to deposit the proceeds in the Eastern District of Wisconsin for garnishment," (Count II of the Complaint), or (3) mandating "equitable marshaling" of the above-referenced MJ Korea property, (Count III of the Complaint). On February 16, 1995, after conducting a day-long evidentiary hearing, this Court denied the plaintiffs' motion for a preliminary injunction enjoining the Korean Banks from releasing or otherwise transferring interests in mortgages and collateral securing them. (Confirmed in a written order dated February 27, 1995.) On

August 31, 1995, this Court dismissed Counts II and III against the defendant banks pursuant to Federal Rules 12(b)(1) and 12(b)(6).

## B. *Factual Background*

The following facts giving rise to Count I of the Complaint are either undisputed or uncontroverted:

On February 3, 1994, Yong Su Paek, president of Longreen, opened a bank account in the name of Longreen Toys, Inc. at the Sanwa Bank. *See* Supplemental Declaration of Phyllis Blank ("Blank Supp.Dec.") ¶ 8, Exhs. A, B. Paek deposited $2,340,100 into Longreen's account for the stated purpose to "capitalize corporation." *Id.,* Exh. B.

That same day, Paek wrote a check on Longreen's account for $2,310,000 to purchase a number of cashier's checks payable to Brunson & Associates, Inc. *See id* ¶¶ 12, 13, Exhs. F–J. On February 4, 1994, Longreen used $660,000 of these cashier's checks to purchase the assets of MAI at the bankruptcy auction. *See Select II,* 852 F.Supp. at 760 (Longreen purchased MAI assets at auction for $660,000); Supplemental Decl. of John Lyons, Exh. A (Brunson & Associates' application to MAI bankruptcy court for compensation relating to auction); Blank Supp.Dec. ¶ 14 (cashier's checks paid by Sanwa).

On February 8, 1994, Paek redeposited the proceeds from one of the cashier's checks (number 00397466) in the amount of $250,000 into Longreen's account. *See* Complaint, Exh. 9; Blank Supp.Dec. ¶ 17, Exh. C. That same day, Paek wrote a check on Longreen's account payable to Sanwa Bank in the amount of $213,030.92. Complaint, Exh. 23. The proceeds from this check were used to purchase five cashier's checks: (1) check number 00397431, payable to UCNB in the amount of $12,080 (Complaint, Exh. 27; Blank Supp.Dec., Exh. Q); (2) check number 00397148, payable to United Citizens National Bank (UCNB) (now known as NARA Bank) in the amount of $13,248 (Complaint, Exh. 25; Blank Supp.Dec., Exh. R); (3) check number 00397147, payable to UCNB in the amount of $42,682.92 (Complaint, Exh. 26; Blank Supp.Dec., Exh. S); (4) check number 00397150, payable to UCNB in the amount of $45,000 (Complaint, Exh. 24;

Blank Supp.Dec., Exh. T); and (5) check number 00397149, Payable to MJ Korea in the amount of $100,000 (Blank Supp.Dec., Exh U). *See also* Blank Supp.Dec., Exh. C (check for $213,030.92 paid on "02–08").

That same day, February 8, 1994, Longreen paid $13,248 to defendant Industrial Bank of Korea to pay off a bill of exchanged owed by ConPro, a corporation affiliated with Joy Lee. Supplemental Declaration of Hannah Shin ("Shin Supp.Dec.") ¶ 7 (ConPro bill of exchange paid); Complaint, Exh. 25. *See Select II,* 852 F.Supp. at 751, 754, 776 (ConPro Lee affiliation). Cashier's check number 00397148 was used to make this payment.

On February 9, 1994, Paek exchanged all of the remaining cashier's checks issued on February 3, 1994—with the exception of the $250,000 check that Longreen deposited on February 8, 1994 in exchange for the five above-referenced cashier's checks—for cashier's check number 00397651 made out to Longreen Toys, Inc. in the amount of $1.25 million and cashier check number 00397653 made payable to MJ USA Branch for $150,000. *See* Complaint, Exh. 8, 10–12, 14–16; Blank Supp.Dec. ¶ 15, Exhs. K, L, M, N.

During February and March of 1994, Longreen used three of the February 8, 1994 cashier's checks to pay the bill of exchange obligations on behalf of other entities. First, on February 18, 1994, Longreen's cashier's check number 00397431 in the amount of $12,080 was used to pay another bill of exchange owed by ConPro in that same amount in favor of the Industrial Bank of Korea. *See* Complaint, Exhs. 27, 30; Shin Supp.Dec. ¶ 6; Affidavit of Hoon Seong Choe ¶ 4. Second, on February 23, 1994, Longreen's cashier's check number 00397147 in the amount of $42,682.92 was used to pay a bill of exchange owed by MAI, Inc. in the same amount in favor of Cho Hung Bank. *See* Complaint, Exhs. 26, 31; Shin Supp.Dec. ¶ 6. Finally, on March 3, 1994, Longreen's cashier's check number 00397150 in the amount of $45,000 was used to pay a bill of exchange owed by UDL Group in the same amount in favor of the Commercial Bank of Korea. *See* Complaint, Exhs. 24, 33; Shin Supp.Dec. ¶ 6.

On March 14, 1994, Longreen exchanged cashier's check number 00397651 in the amount of $1,250,000 for cashier's check number 00397787 in the amount of $1.1 million. Blank Supp.Dec. ¶¶ 20, 21, Exhs. K, V. On March 17, this cashier's check (number 0039787) was exchanged for: (1) cashier's check number 00397793 in the amount of $599,100 payable to the California Korea Bank; and (2) cashier's check number 00397794 in the amount of $498,802.16 payable to the NORA bank. Blank Supp.Dec. ¶¶ 22, 23, Exh. W. The second cashier's check was apparently made out incorrectly; on March 29, 1994, check number 00397794 was exchanged for check number 00397920 payable to NARA bank. Blank Supp.Dec. ¶ 25.

On April 4, 1994, these two cashier's checks were used to pay the obligations of MAI, MHW, and ConPro through the California Korea Bank and NARA Bank (fka UCNB). *See* Complaint, Exhs. 39–69; Shin Supp.Dec. ¶ 8. Longreen deposited cashier's check number 00397793 in the amount of $599,100 with the California Korea Bank. At Longreen's direction, the California Korea Bank immediately applied to proceeds to pay down debts owed by MHW, Inc. under bills of exchange to Hanil Bank, KEB, and Cho Hung Bank. *See* Complaint, Exhs. 38–54. Longreen deposited check number 00397920 in the amount of $498,802.16 with the NARA Bank. At Longreen's direction, NARA Bank paid down the debts of MHW, Inc., MAI, Inc., and ConPro, Inc., under bills of exchange to defendants Commercial Bank, Industrial Bank, Hanil Bank, and Cho Hung Bank. *See* Complaint, Exhs. 55–69.

## II. *LEGAL STANDARD*

Federal Rule of Civil Procedure 56 requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

The party moving for summary judgment bears the initial burden of showing that there are no material facts in dispute and that judgment should be entered in its favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.1990), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). A plaintiff moving for summary judgment bears a substantial initial burden; it must show that the evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Once the movant satisfies this initial burden, the burden then shifts to the non-moving party, who must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990).

In evaluating a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citation omitted).

## III. *DISCUSSION*

### A. *Jurisdiction and Venue*

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 754, 1651 and Federal Rule of

Civil Procedure 69 (jurisdiction relating to receivership and enforcement of writs) as well as pursuant to 28 U.S.C. § 1332 (diversity of citizenship). *See* Plaintiff's Proposed Findings of Undisputed Facts (PPFOF) ¶ 8. *See also Skevofilax v. Quigley,* 810 F.2d 378 (3d Cir.1987) (en banc), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1956, 95 L.Ed.2d 528 (1987). Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(d) (aliens may be sued in any district). *See also* PPFOF ¶¶ 13, 14. The defendants have not challenged personal jurisdiction.

### B. *Analysis*

The plaintiffs allege that the financial transactions described in section IB, *supra,* should be avoided because they violate the Uniform Fraudulent Transfers Act (UFTA). Both Wisconsin and California—the only states in any way connected with this lawsuit—have adopted the UFTA. *See* Wis. Stats. § 242.01 *et seq.;* Cal.Civ.Code § 3439.04. "Where the law of the two states is essentially the same, we apply the law of the forum state." *International Administrators, Inc. v. Life Ins. Co. of North America,* 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). Accordingly, because Wisconsin is the forum state in this action, the Court will apply Wisconsin law to this dispute.

Under the UFTA, a transfer of funds is fraudulent as to *present and future* creditors if:

> The debtor made the transfer or incurred the obligation as follows:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (1) Was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (2) Intended to incur, or believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they become due.

Wis.Stats. § 242.04(1). Similarly, under the UFTA a transfer is fraudulent as to *present*

creditors "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent by reason of the transfer." Wis. Stats. § 242.05(1).

In support of their motion for partial summary judgment, the plaintiffs allege that the financial transactions executed by Longreen during the spring of 1994 were fraudulent because the funds in question were transferred in order to prevent Paliafito from collecting its pending $8 million judgment. The plaintiffs, claiming to be present and future creditors of Longreen, seek to have these transfers avoided as fraudulent. *See* Wis.Stats. § 242.07. In opposition to the plaintiffs' motion, the defendant banks argue that the plaintiffs cannot satisfy their summary judgment burden as to each element of the causes of action asserted. The Korean Banks have also invoked an affirmative defense: that they received the Longreen transfers in good faith and for reasonably equivalent value. Wis.Stats. § 242.08(1).

Before taking up each of the specific questions at issue here, we first emphasize the enormity of the burden facing the plaintiffs in their summary judgment motion. Where, as here, the party with the ultimate burden of proof at trial moves for summary judgment, its burden is substantial; it must show that no reasonable jury could find for the defendant. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. This already substantial burden is heightened in a case, such as this, where the plaintiff-movant has a heightened burden of proof at trial. Under Wisconsin law, the plaintiff must prove the elements of a fraudulent transfer by *clear and convincing evidence. Matter of Loyal Cheese,* 969 F.2d 515, 518 (7th Cir.1992) (interpreting predecessor to UFTA, the Uniform Fraudulent Conveyances Act) (citing *Kerbet v. Behling,* 265 Wis 288, 61 N.W.2d 205, 207 (Wis. 1953)). *See also Williams v. Rank & Son Buick, Inc.,* 44 Wis.2d 239, 242, 170 N.W.2d 807 (Wis.1969) ("This Court has consistently held that the party alleging fraud has the burden of proving it by clear and convincing evidence...."). This standard places an ex-

traordinary high bar before the plaintiffs; to clear it, they must introduce compelling evidence to support their version of events. Even if the plaintiffs succeed in introducing such compelling evidence, if the Korean Banks can point to some evidence—beyond a mere "scintilla"—to support their version of events, summary judgment will nevertheless be denied. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511.

### 1. Transfers Fraudulent to Present and Future Creditors—Section 242.04

To prevail on their claim under Wis.Stats. § 242.04, the plaintiffs must establish that Paliafito was a creditor of Longreen, *and that either* (1) Longreen transferred funds to the defendant banks with actual intent to hinder, delay, or defraud Paliafito, *or* (2) Longreen did not receive reasonably equivalent value in exchange for the transfers *and* Longreen believed or reasonably should have believed that it was about to incur debts beyond its ability to pay as they became due.

### a. Intent to Hinder, Delay or Defraud

In determining whether a transfer was made with actual intent to hinder, delay or defraud a creditor, the UFTA permits a court to consider several factors, including the following: (1) whether the transfer was concealed or disclosed; (2) whether the debtor had been sued or threatened with suit prior to the transfer; (3) whether the transfer was of substantially all of the debtor's assets; (4) whether the debtor absconded; (5) whether the debtor removed or concealed assets; (6) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred; (7) whether the debtor was solvent or became insolvent shortly after the transfer was made; and (8) whether the transfer occurred shortly before or shortly after a substantial debt was incurred. Wis.Stats. § 242.04(2).

In support of their contention that Longreen transferred the funds in question with the intent to "hinder, delay or defraud," the plaintiffs point to what they characterize as numerous "badges of fraud" which suggest that Longreen transferred the funds in an attempt to avoid Paliafito's default judgment. Specifically, the plaintiffs contend:

• Longreen transferred the bulk of the funds in question in direct violation of this Court's February 25, 1994 Order which expressly enjoined it from transferring funds. With respect to those funds transferred before the February 25th injunction, Longreen knew of the Court's preliminary writs of attachment and judgment against the Mantae defendants freezing their assets.

• Longreen concealed the transfers from the Court and Paliafito.

• Longreen transferred substantially all of its assets.

• Longreen's president, Paek, left the country shortly after the discovery of the transfers.

• Longreen had previously removed and concealed assets, specifically during the February 1994 hearing before this Court.

• Longreen did not receive any benefit from the transfers.

• Prior to and after the transfers, Longreen was insolvent.

• Longreen transferred the funds shortly before, and in anticipation of, the Court's April 27, 1994 ruling entering judgment against it. (*See* Plaintiffs' Memorandum in Support of Summary Judgment at pp. 8–10.) From these facts, the plaintiffs argue that the only reasonable inference a factfinder could draw is that Longreen acted with intent to defraud.

In response, the Banks argue that Mr. Paek, acting on behalf of Longreen, did not act with the intent to defraud Paliafito, but rather simply misunderstood the legal proceedings involving Longreen. The defendants claim that Mr. Paek did not think that the Longreen transfers violated the Court's injunction because he viewed the payments as being for "ordinary and usual purposes," which were permitted under the order. According to the Banks, if Mr. Paek "believed that the payments were permissible, it made sense to pay off what amounted to Longreen's creditors rather than holding the money in case a judgment was rendered against Longreen." (Defendants' Surreply

at p. 16.) The defendants further argue that Mr. Paek used cashier's checks, not in an attempt to conceal the transfers, but because he had only recently arrived in this country and because bank checks are more commonly used for transactions such as these in Korea. (*Id.*) In addition, the Banks claim that language barriers explain Mr. Paek's confused answers to the Court's questions regarding the cashier's checks at the February hearing. (*Id.*) Finally, the Banks contend that Longreen did in fact receive equivalent value for the transfers, inasmuch as the money was used to pay debts of affiliated entities.[2] (*Id.* at p. 17.)

In our view, the banks innocent explanation of the Longreen transfers rings rather hollow. Given all the attendant circumstances, it seems relatively clear to the Court that Longreen transferred the funds in question in an attempt to avoid the Paliafito judgment. However, given the extraordinarily high burden the plaintiffs must satisfy to prevail on this motion, we cannot find, as a matter of law, that Longreen acted with intent to defraud. Although we view it as unlikely, a reasonable jury could conclude that the plaintiffs' failed to establish intent to defraud by clear and convincing evidence, especially if it finds Mr. Paek's story believable or his testimony credible. Accordingly, the plaintiffs' motion for summary judgment on their section 242.04(1)(a) claim will be denied.

### b. Reasonably Equivalent Value

■ The plaintiffs alternatively argue that the transfers should be deemed fraudulent because Longreen did not receive reasonably equivalent value in exchange for the transfers of funds and that Longreen knew or should have known that it was about to incur debts beyond its ability to pay. In fact, they argue that because Longreen simply paid-off the debts of other entities, it received absolutely *no value* in exchange for the money transferred. In response, the Korean Banks argue that Longreen received both a direct benefit and an indirect benefit from the transfers as a result of the relationship between Longreen, MAI, MHW, ConPro, and UDL.

■ The Korean Banks first argue that Longreen received a direct benefit from the transfers because the money transferred was used to pay off an antecedent debt. *See* Wis.Stats. 242.03(1). Under the defendants' theory, the antecedent debts of MAI, MHW, ConPro, and UDL were also the antecedent debts of Longreen because these entities were, in actuality, parts of the same entity. In support of this argument, the Banks rely on the fact that Paliafito successfully argued that Longreen and MHW were the "alter egos" of MJ Korea in the underlying Paliafito litigation. *See Select Creations,* 852 F.Supp. at 774–76. Normally, the alter ego doctrine is used to "enable[ ] a court to disregard the corporate form when it is used to accomplish an improper purpose." *Select Creations,* 852 F.Supp. at 773. However, the doctrine may also be applied in reverse, thus permitting a party to reach the assets of a controlled entity where "the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the preexisting liability of the controlling party". *Id.* at 774. It was pursuant to the reverse alter ego doctrine that the Court found Longreen liable (and subject to our jurisdiction) in the first place; because it was used to conduct business on behalf of the controlling party—MJ Korea.

The Court concludes that the Korean Banks' direct benefit argument fails for at least three reasons:

First, this Court has never specifically found that UDL or ConPro were the alter egos of MJ Korea or any other Lee/Han entity. Therefore, this theory of defense could only apply to those Longreen transfers made in favor of MHW, and possibly MAI.

■ Second, a party invoking the alter ego doctrine is required to show that some unfair burden will be imposed upon it if the corporate form is respected. The Korean Banks have failed to do so. The alter ego doctrine is usually invoked to allow a plaintiff to "pierce the corporate veil to impose liability on a defendant who unjustly seeks protection in the corporate form." *Lumpkin v.*

---

**2.** For a full discussion of this issue, see section III.B.1.b., *infra.*

*Envirodyne Industries, Inc.,* 933 F.2d 449, 460 (7th Cir.1991), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). *See also Select Creations,* 852 F.Supp. at 773 ("[I]f an intracorporate affiliation is devised for or is being used to accomplish an improper or unlawful purpose, equity has the authority to tear down technical legal barriers . . . and grant appropriate relief.") (quoting 1 Fletcher Cyclopedia Corporations § 41.10 at 157). Here, the defendants invoke the alter ego doctrine as a defense to liability, not as a means for imposing liability upon a corporate entity structured for an improper purpose. This is not an appropriate use for the alter ego doctrine: "The alter ego doctrine is a sword, not a shield, the basis for a cause of action, not a defense." *Lumpkin,* 933 F.2d at 460. *See also Matter of Xonics Photochemical,* 841 F.2d 198, 201 (7th Cir.1988) ("[T]here is no 'automatic piercing of the corporate veil' in affiliation settings. The assets of affiliated corporations are to treated as a common pool available to creditors of each affiliate unless unusual circumstances are present that would make it inequitable to allow the other affiliates to set up the principle of limited liability . . . ."). We are not persuaded by the defendants' argument that *Lumpkin* is distinguishable because the defendants here invoking the doctrine did not create the corporate structures for improper purposes; rather, they are innocent third parties. Clearly, the Korean Banks are less culpable than the defendant in *Lumpkin* which sought to disregard its own corporate form. However, in our view, the defendants' theory calls for a considerable extension of the current scope of the alter ego doctrine, one unjustified in the circumstances here present.

■ Finally, in our view, the Korean Banks' invocation of the alter ego doctrine is misplaced. The plaintiffs here do not claim that Longreen and MHW are not affiliated with MJ Korea, or even that these entities are not the alter egos of MJ Korea. Rather, the plaintiffs here simply claim that Longreen did not receive a direct benefit by paying off the debts of MAI, MHW, ConPro and UDL. Regardless of these entities' relationship to MJ Korea, Longreen could only have received a direct benefit from the trans-

fers if Longreen was somehow obligated to pay the debts of these other entities. Ordinarily, the debts of affiliated corporations are not enforceable against each other. *See Matter of Xonics Photochemical,* 841 F.2d at 201. The Korean banks have made no showing to the contrary; therefore, their argument fails.

■ In a related argument, the defendant Banks argue that the plaintiffs should be judicially estopped from arguing that Longreen was not simply an organ of MJ Korea when they made precisely that argument before this Court during the underlying Paliafito litigation. *See Lumpkin,* 933 F.2d at 460 (citing *Goldstein v. Scott,* 108 Ill.App.3d 867, 64 Ill.Dec. 374, 378, 439 N.E.2d 1039, 1043 (1982)). In our view, the plaintiffs have not taken inconsistent positions. In the *Paliafito* litigation, the plaintiffs argued that MHW and Longreen were the alter egos of MJ Korea; here the plaintiffs argue that Longreen was not obligated to pay the debts of MAI, MHW, ConPro and UDL. Therefore, the Court concludes that the doctrine of judicial estoppel does not apply to this case.

■ The Korean Banks argue in the alternative that Longreen received certain indirect benefits from the transfers it made on behalf of MAI, MHW, ConPro, and UDL. This argument is a softer version the defendants' direct benefits argument; instead of contending that it paid its own antecedent debts via the transfers in question, here the defendants simply argue that all of these entities—Longreen, MAI, MHW, ConPro, UDL, and MJ Korea—are sufficiently closely related so that Longreen did in fact receive some benefit by paying the debts of its sister corporations. The Korean Banks' argument begins with the uncontroverted proposition that "the Lee/Han entities were inextricably tied up with one another." (Memorandum in Opposition to Plaintiffs' Motion at p. 16.) The defendants proceed to argue that Longreen received indirect benefits from the transfers because,

> [i]t had to be in the best interests of all of the Lee/Han entities, including Longreen, that a good credit relationship be maintained with the banks. To do this,

they could not default on the paper that the banks had purchased. Longreen's payments to the banks would accomplish this result and, in so doing, benefit Longreen as well as the other Lee/Han entities. The payments that Longreen allegedly made to pay the debts of Conpro, UDL, MHW, and Many Amazing Ideas most probably protected Longreen's ability to gain necessary credit in the future and, therefore, gave it a definite benefit.

(*Id.* at pp. 16–17.)

This defense to liability invoked by the Korean Banks derives from a defense to liability under the Uniform Fraudulent Conveyances Act (UFCA). Although the UFCA is not the basis for the plaintiffs' claim here, the principles at issue are basically the same. Under the UFCA, a transfer of funds made without "fair consideration" constitutes a fraudulent conveyance, voidable under the Act. We view the question of whether a transfer is made without "fair consideration" to be basically the same inquiry as whether a transferor receives "reasonably equivalent value" under the UFTA.

Ordinarily, "a transaction, the consideration for which was an antecedent debt of a corporation owed by one other than the corporate grantor, was not supported by 'fair consideration' under the Uniform Fraudulent Conveyances Act." *Telefest, Inc. v. VU–TV, Inc.*, 591 F.Supp. 1368, 1377 (D.N.J.1984) (citing *In re B–F Building Corp.*, 312 F.2d 691 (6th Cir.1963), *Davis v. Hudson Trust Co.*, 28 F.2d 740 (3d Cir.1928) and *Edward Hines W. Pine Co. v. First Nat'l Bank*, 61 F.2d 503 (7th Cir.1932)). However, courts have recognized an exception to this general rule "if the debtor and the third party are so related or situated that they share an 'identity of interests', because what benefits one, will in such case, benefit the other to some degree." *Id.* at 1378 (quoting *In re Royal Crown Bottlers of North Alabama*, 23 B.R. 28, 30 (Bkrtcy.N.D.Ala.1982)). *See also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir.1995) ("[T]he fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction.").

In order to escape liability under the UFTA, the Banks must show that Longreen somehow received indirect benefits by maintaining the good credit of its affiliated corporations. These benefits, to constitute "reasonably equivalent value" under the Wisconsin statute, must go beyond some speculative, ephemeral psychic satisfaction that might result from doing a favor for a friend. We are extremely skeptical that the defendants will be able to persuade a jury that the benefits Longreen did receive reach that level, especially given the "fly-by-night" nature of Longreen and its close ties to the Han family. Moreover, the facts presented here in support of an indirect benefit for Longreen are not nearly as strong as those present in the cases cited by the defendants. In contrast to *Telefest*, the Korean Banks did not consider Longreen related to the entities to which it extended credit when the credit was extended. Indeed, Longreen did not even exist at the time credit was extended. In *HBE Leasing*, the transfers in question were for the payment of attorneys' fees on behalf of an affiliate. The Second Circuit concluded that the transferor benefitted indirectly from these transfers because the attorney's fees related to the presentation of a common defense where the transferor and transferee were subject to joint and several liability. *See HBE Leasing*, 48 F.3d at 638–39. This is a much more concrete indirect benefit than can be found under the defendants' theory. Finally, in *Matter of Fairchild Aircraft*, 6 F.3d 1119 (5th Cir.1993), the record included concrete evidence documenting how the transferor received benefits from its payment of the bills of a customer. *Id.* at 1123–24. Such hard evidence is missing from this record.

However, given the demonstrably close relationship between Longreen, MAI, MHW, UDL, and ConPro, it is plausible (though unlikely) that the benefits received by Longreen from the transfers did in fact constitute "reasonably equivalent value." Given the extremely high burden borne by the plaintiffs in moving for summary judgment on this cause of action, we conclude that this question should be decided by the trier of fact. We cannot conclude that no reasonable

jury could find that the plaintiffs have established the absence of reasonably equivalent value by clear and convincing evidence.

Having concluded that there is a genuine issue of fact regarding the existence of reasonably equivalent value for the Longreen transfers, we need not reach the question of whether the plaintiffs can establish the second element of the 242.04(1)(b) cause of action—that Longreen believed or reasonably should have believed that it was about to incur debts beyond its ability to pay as they became due. However, we note that this sort of question is normally a question of fact for the jury as well. *See Porter v. General Casualty Co.*, 42 Wis.2d 740, 749, 168 N.W.2d 101 (1969). Regardless, the Court concludes that the plaintiffs have failed to satisfy their burden to justify summary judgment on their claim under Wis.Stats. § 242.04(1)(b). Accordingly, their motion will be denied in this regard.

### 2. Transfers Fraudulent as to Present Creditors—Section 242.05

To prevail on their claim under Wis. Stats. § 242.05, the plaintiffs must establish that Paliafito was a creditor of Longreen's at the time the transfers were made and that Longreen made the transfer without receiving a reasonably equivalent value in exchange *and that either* (1) Longreen was insolvent at the time of the transfer or (2) Longreen became insolvent as a result of the transfer. Because the Court has already determined that there is a genuine factual dispute over whether Longreen received reasonably equivalent value for the transfers in question, the plaintiffs fail to establish an essential element of this claim. Accordingly, the plaintiffs' motion must be denied with respect to this cause of action as well.

### IV. *ORDER*

For the foregoing reasons, the Court concludes that there are genuine factual disputes regarding the essential elements of the plaintiffs' cause of action. Accordingly,

**IT IS HEREBY ORDERED** that the plaintiffs' motion for summary judgment is **DENIED**.

The Court requests the appearance of counsel for the parties at a scheduling conference set for *9:00 o'clock a.m. on Monday, April 8, 1996,* in Courtroom 390, Federal Building, 517 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.

**SO ORDERED.**