WILLIAM GOLDSTEIN, Plaintiff-Appellee, v. DAVE SCOTT et al., Defendants-Appellants.—(SUBURBAN TRUST & SAVINGS BANK, Trustee, et al., Defendants.)

First District (4th Division)   No. 81—1914

Opinion filed August 26, 1982.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (John J. Treacy, of counsel), for appellants.

Arnold H. Landis, of Chicago, for appellee.

JUSTICE ROMITI delivered the opinion of the court:

Plaintiff sued for damages when the porches of a building fell on the garage he was renting and damaged the merchandise inside. The judge directed a verdict for plaintiff as to defendants-appellants' liability and sent only the issue of damages to the jury which awarded $40,000. The defendants-appellants (appellants) have appealed contending in their initial brief that the court erred (1) in piercing the corporate veil of the corporation which was the beneficial owner of the property and holding appellants liable; (2) in holding appellants liable as a matter of law for the damage to the property; (3) in denying appellants' motion for a mistrial after plaintiff twice referred to insurance adjusters on the property before the accident; (4) in refusing to permit a single page of plaintiff's tax return, which page failed to reveal a casualty loss, to be admitted in evidence.

We find no error and affirm.

The property in question is located on the south side of West Armitage. On the front of the lot is a three-story brick apartment house; on the back of the apartment house were attached wooden porches. In back of the apartment house was a garage which plaintiff rented to store merchandise for his furniture store on Milwaukee Avenue.

Initially the property was owned by George Mayer. It was foreclosed. A subsequent owner gave it to Calvary Tabernacle Assembly of God (Calvary), one of the defendants-appellants. Dave Scott (Scott), the other defendant-appellant, was the pastor of the church. Calvary set up a separate corporation, Life Center No. 3 (Life Center), to be the beneficial owner of the property; Scott was the president of the corporation. Title to the property was held by Suburban Trust & Savings Bank under a land trust. On April 3, 1975, after a large snowfall, the wooden porches collapsed onto the roof of the garage; it in turn collapsed damaging the merchandise inside. Plaintiff filed suit against

Calvary, Scott and certain other defendants on July 31, 1975. Thereafter the property was sold, Life Center was dissolved and its assets transferred to Calvary.

As already noted, after the evidence was heard, the trial court directed a verdict of liability against Calvary and Scott and the jury awarded $40,000 in damages.

## I

The primary issue in this case is whether the trial court erred in piercing the corporate veil, *i.e.*, finding that as a matter of law Life Center was simply the alter ego of Calvary.

The property in question was given to the church in 1974 so it could set up a center of ministry in the inner city. Life Center Ministry was formed for the purpose of the ministry on advice of counsel. Suburban Trust & Savings Bank held the title in a land trust of which Life Center was the beneficiary. The bank's files indicated, however, that inquiries were to be made, not to Life Center, but to Scott at Calvary and notice of building code violations were sent to Scott.

David Scott, Wally Nard, and Jerold Proctor were the directors of Life Center; they were also directors of Calvary. The liability insurance, later reformed to include property insurance, was not taken in the name of Life Center. Rather an endorsement covering the Armitage property was added by Preferred Risk Mutual Insurance Company to a policy already insuring Calvary Tabernacle Church and Chicago Christian Academy. Life Center was not named in the policy. The property was sold after the loss and after the present lawsuit was filed. The proceeds of the sale were not retained by Life Center. Rather, Life Center was dissolved and the assets transferred to Calvary.

Sometime after this Calvary filed suit in Federal Court against Preferred Risk Mutual Insurance Company to recover for the damage to the property sustained on April 3, 1975, including the damage to the garage. Calvary sought to have the policy, which purportedly only afforded liability coverage to Calvary for the Armitage property, reformed to also provide liability coverage.[1]

In connection with that lawsuit, Scott filed an affidavit in Federal Court on September 16, 1977. In it he swore under oath that:

1. Life Center No. 3 and Calvary had been interlocking in their

---

[1]The complaint including the insurance policy was not part of the record but was attached to the appellee's brief on appeal. Appellants have raised no objection to its use and indeed have referred to the documents in their own argument. Thus any objection was waived.

purposes and objectives.

2. The two corporations were served and functioned through interlocking boards of directors consisting of the same persons.

3. The interests of Calvary and Life Center in the premises were for practical purposes considered identical by both corporations and their directorates, "as witness reference to subsequent sale thereof."

The affidavit also quoted from a deposition of Scott in which he said the *church* was paid $60,000 for the sale of the property and to a deposition of Proctor in which he said there was really no distinction between Calvary and Life Center from a practical point of view. On December 20, 1979, the Federal district court held:

"It seems clear to me that the plaintiff Calvary Tabernacle Church has an insurable interest in this property on Armitage Avenue.

The uncontradicted evidence is that the corporation which was the beneficial owner of the property is simply an alter ego of the church, organized for purposes of carrying out church business; and there's [*sic*] a virtual identity of purpose, personnel, and financial interest, and therefore I believe that the plaintiff is a proper party to sue under this contract of insurance and it does have an interest under the policy."

It reformed the policy to provide property coverage instead of just liability coverage.

■ The confusion and commingling of Calvary and Life Center has continued to the present. Appellants in their reply brief denied that Calvary procured the dissolution of Life Center and acquired its assets without providing funds to satisfy its obligation to the plaintiff since, according to appellants, Life Center was insured by the Preferred's liability policy, a copy of which was set forth in appellee's brief. That policy, however, as already noted, names only Calvary and Christian Center as insureds and not Life Center. It is axiomatic that a liability policy insures only those persons named in the policy (see, for example, 7A Appleman, Insurance Law and Practice sec. 4491.01 (1979), and additional insureds qualifying under some clause extending coverage. No such clause is shown here.

It is not necessary or even proper for this court to determine whether, as a matter of law, the corporate veil should have been pierced since relitigation of that issue would be improper. Calvary is barred by Calvary's actions in the Federal Court, Scott's affidavit, and the judgment of the Federal District Court that Life Center was simply an alter ego of the church (*Finley v. Kesling* (1982), 105 Ill.

App. 3d 1, 433 N.E.2d 1112), and the district court's finding was a material finding essential to its ultimate judgment that Calvary could recover on the insurance policy.

█▌█ Calvary was the sole plaintiff in the action brought against preferred. It was an insured under the policy. But it could only recover if it had an insurable interest in the property, both when the insurance was obtained and at the time of the loss. (*Reznick v. Home Insurance Co.* (1977), 45 Ill. App. 3d 1058, 360 N.E.2d 461; *Patterson v. Durand Farmers Mutual Fire Insurance Co.* (1940), 303 Ill. App. 128, 24 N.E.2d 740; 4 Appleman, Insurance Law and Practice secs. 2121, 2122 (1969).) Calvary in its complaint alleged such insurable interest when it alleged that it had acquired title to the property. Scott's affidavit was used by Calvary to establish this insurable interest by establishing that the beneficial owner, Life Center, was merely Calvary's alter ego and there was no practical difference between the two corporations. The district court, convinced by this, so found. That finding is binding on this court, even though Goldstein was not a party to the Federal Court action. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1979), 78 Ill. 2d 1, 398 N.E.2d 9.) Furthermore, Calvary having sought the finding that it was Life Center's alter ego, having so testified in detail under oath, and having obtained the finding it so vigorously sought, is judicially estopped from denying in this action that it is Life Center's alter ego. (*Finley v. Kesling* (1982), 105 Ill. App. 3d 1, 433 N.E.2d 1112.) As we stated in *Finley* a party cannot play "fast and loose" with the court below or blow "hot and cold" during the course of litigation. When a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position. *Garden City Sand Co. v. Christley* (1919), 289 Ill. 617, 124 N.E. 729; *Finley.*

█ Appellants in their reply brief contended that Calvary had simply recovered what Life Center would otherwise have been able to recover, Calvary having succeeded to Life Center's right to the proceeds when Life Center was dissolved. This contention is totally without merit. First of all, while it is true that the right to recover on a property insurance policy may be assigned after the loss (*Brown v. State Farm Fire & Casualty Corp.* (1975), 33 Ill. App. 3d 889, 338 N.E.2d 427), Calvary did not sue on an assignment and never alleged or argued the existence of an assignment; rather it relied on its own interest in the property. Far more important, however, is the fact that Life Center was never insured by the policy and had no right to recover on the policy even though it had suffered a property loss. Prop-

erty insurance does not insure property but the interest of the insured named in the policy. (*Miyata v. Peerless Insurance Co.* (1981), 95 Ill. App. 3d 584, 520 N.E.2d 493; *Patterson v. Durand Farmers Mutual Fire Insurance Co.* (1940), 303 Ill. App. 128, 24 N.E.2d 740; *Bryant v. Transamerica Insurance Co.* (Ky. 1978), 572 S.W.2d 614; 4 Appleman, Insurance Law and Practice sec. 2105 (1969).) Thus the naming of the property in Calvary's policy did not cause Life Center to be insured. As the policy specifically provided, it only insured the interest of the insured Calvary. It did not in addition cover the interest of the unnamed Life Center. (*Miyata v. Peerless Insurance Co.* (1981), 95 Ill. App. 3d 584, 420 N.E.2d 493; *Doss v. Roberts* (Tex. Civ. App. 1972), 487 S.W.2d 839, *writ ref'd, n.r.e.*; *Flint Frozen Foods v. Firemen's Insurance Co.* (1952), 8 N.J. 606, 86 A.2d 673; 5A Appleman, Insurance Law and Practice secs. 3331, 3361 (1970).) Thus Calvary could only have recovered in the Federal suit by establishing its own interest in the property which it did.

■ The issue as to Dave Scott is, however, quite different. Obviously the fact that the Federal Court held Calvary to be Life Center's alter ego does not bar Scott from contending he is not liable for Life Center's wrongs. Likewise the affidavit filed by Scott in the Federal Court as to *Calvary's* relationship to Life Center does not affect *Scott's* relationship. Similarly the evidence summarized before indicating the interrelationship of *Calvary* and Life Center does not, of itself, show why *Scott* should be held liable absent a showing that Scott is responsible for Calvary's conduct. Appellee in its brief suggests that Scott was held liable on an agency theory; normally, however, an agent is not liable for the conduct of his principal, at least if that principal is disclosed, but is only liable for his own torts. Furthermore, Scott, as an officer of a corporation, cannot normally be held liable for acts he performs as the corporation's agent unless he violates some duty he personally owes to the third person. At best it would be a question for the jury. However, the two defendants filed a joint brief only arguing their mutual liability. Nowhere and at no time has Scott sought to have the judgment reversed and remanded as to him even if the judgment against Calvary is affirmed. To the contrary appellants suggest in their reply brief that since there is an essential identity of interest between Scott and the church, the issue of Scott's liability is moot. Accordingly we must assume that in light of our affirmance of Calvary's liability, Scott's individual claim of error is waived.

## II

In their initial brief on appeal appellants also contended that even

if the trial court properly pierced the corporate veil, it was error to direct a verdict against defendants on the issue of liability; that plaintiff's reference to insurance was grounds for mistrial, and it was error to refuse to admit one page of plaintiff's tax return into evidence. These issues were not argued on oral argument and they appear to have been abandoned. Nevertheless we will touch on them briefly.

Normally the questions of negligence and causation are for the jury. (*Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93; *Lode v. Mercanio* (1979), 77 Ill. App. 3d 150, 395 N.E.2d 1014.) However when the evidence only supports a verdict for the plaintiff and no verdict for the defendant would be reasonable, then a verdict is properly directed for the plaintiff. *Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 382 N.E.2d 239.

Plaintiff testified that he initially rented the garage from Mayer in the early 1970's. The lease which was written was for "three or five years." There was no cancellation provision. In front of the garage on the same property was a three story apartment house. There were wooden porches on the rear of the apartment building. The porches were about four feet north of the garage. The garage itself had a rounded roof. Inside there were wood supports; the floor was cement.

There was an ongoing problem with leakage in certain spots; Mayer would send someone over to patch it but that was not really sufficient. The leakage was just in certain areas so plaintiff kept the merchandise away from those areas. Mayer did not have a key to the warehouse; but he would get access to the roof from the outside very easily. He did not even need a ladder. He could go from the porch landing onto the roof; it was that close.

The property was foreclosed sometime in 1973 and taken over by a bank to which plaintiff then made rent payments. In February 1974 he was directed to make his rental payments to Life Center. Shortly after this Dave Scott visited plaintiff at his store. Plaintiff told him the roof was leaking. Scott told him that as soon as they got into the building, they were going to work on it.

In April 1974 plaintiff received a letter stating that as of May the rent would be $350 a month and the increase was necessitated because of the expense involved in repairing the building. Plaintiff called Scott after he received the letter. Scott said they were going to put a new roof on the warehouse. Plaintiff said in that case he would pay the additional $100.

Scott did clean the gutters and do some patching. The gutters were always full of garbage from the apartment building because the

tenants were always throwing refuse onto the roof. The patching neither solved nor helped the problem and, when plaintiff complained, Scott promised when they had the funds, they would put a new roof on the building.

Plaintiff made rent payments until almost to the end of 1974. He then stopped paying because nothing had been done.

On April 2, 1975, there was a heavy snowfall which dumped a foot of snow on the city. When the plaintiff came to the property he found the garage had collapsed. The porches from the apartment house were on top of the garage. The wall on the north side of the garage was caved in, to the south. The alley wall was still standing. The south wall was partially standing. About 85-90% of the roof was collapsed; that portion still up was on the west and south side of the garage. The porches were lying on top of the roof.

Very little of the merchandise was salvageable. It was wet and soggy. Also it was too dangerous to try to get most of it out.

Plaintiff testified that during the time he was a tenant, he made no repairs to the roof.

Kenneth Schar, a retired lieutenant of the fire department, also testified for plaintiff. He had been with the fire department for 25 years at the time of his retirement in 1980. He had dealt with many building collapses. He had been involved in the handling of the collapse of plaintiff's building. He remembered that there had been over 10 inches of snow and it was very wet and heavy. It was, however, comparatively warm.

The fire department received a call that a building had collapsed and went to the scene. Schar was in charge. He found a warehouse which was completely collapsed. The back wooden porches of the building on Armitage, about 10 feet north of the garage, had broken away from their knockout holds on the structure and were laying on top of the roof. The porches had separated and fallen on the adjacent warehouse causing total collapse. All four walls were down. The bricks from the north wall fell to the south.

When asked what caused the garage to collapse, the witness answered:

"A. Overweight and being struck by the porches.

Q. Being struck and what else?

A. Overweight and just the added weight of it.

Q. The added weight of the porches?

A. Yes, conditions were just right."

Schar testified that the porches pulled away from the knockouts. It was his expert opinion that porches in reasonably good condition

would have held despite the weight of the snow. This type of porch was common but the witness was not aware of any other collapsing on that day. If there had been, they would have gone on call to it.

Talby Glacone, former city building inspector, testified that he had inspected the Armitage property in 1972 as court inspector. He inspected various aspects of the building including the rear porches. As to the porches, he observed weak and rotted members, that is sections making up the porch. There were missing pickets. The porches were potentially hazardous. He again observed the property in the spring of 1973. There had been an attempt to repair the porches which was unacceptable because done in a very amateur way.

Dave Scott testified that the property was in poor condition when they took it over. He inspected the property, including the porches, before the church took over the property. The porches did not look weak to him. He admitted that he had not jumped up and down on the porches to determine if they were solid. He did not observe any patching. He did not observe any pickets. He was not concerned about the porches the day he looked at the building.

The porches were used by the tenants of the apartments and were common areas.

Scott admitted knowledge of a complaint by the city of Chicago that the porches were in poor condition. Scott claimed it was a pre-existing condition over which they had no responsibility. Scott also admitted that a building inspector told him the porches needed some repair and they proceeded to undertake repairs of the porches—some replacing of the vertical slats and some of the siderails around the porches plus a couple of steps.

Scott also admitted that he had told plaintiff they intended to rehabilitate the property and the reason for the increase in rent was to fund the rehabilitation. A roofer who fixed the roof of the apartment building told him it would take $1,000 to put the garage roof in good condition. They did not ever put the garage roof in good condition although they did do some work on the roof on more than one occasion—some patching around the edges and around the skylights, and the gutters. They had no trouble getting on the roof for the purpose of repair.

Appellants contended in their initial brief that a jury could have concluded that the garage collapsed solely due to the defective condition of its roof and not because of the collapse of the porches. There was, however, no evidence in the record to support this contention. The only evidence in the record, including Schar's testimony and the evidence that the building did not collapse straight down but to-

ward the south (the direction in which the porches had fallen), supports the conclusion that the fall of the porches caused the collapse of the garage. Likewise, there was no evidence from which the jury could have concluded that the collapse of the porches was due solely to the snowfall and not in part to their defective condition. To the contrary, the only evidence in the record was to the effect that other porches in the area did not collapse despite the snowfall. Furthermore we are forced to note that in their amended post-trial motion appellants did not contend that the evidence failed to show that the collapse of the porches caused the collapse of the roof or that the question of causation was one for the jury.

■■ Appellants did argue in the amended post-trial motion and, in passing, in their initial brief on appeal, that the evidence did not conform to the allegations in the amended complaint. In the amended complaint plaintiff relied on the negligent repair of the roof and the breach of the contract to repair the roof. A search of the record discloses that appellants did not object to the variance prior to the post-trial motion. Accordingly, it is waived. 2 Ill. L. & Prac. *Appeal and Error* sec. 249 (1953).

Since we agree with the trial court that the evidence discloses that as a matter of law appellants are liable for the fall of the porches onto the garage, we need not consider plaintiff's alternative contention that appellants agreed to repair the garage roof. This is especially true since there was no evidence the garage would have collapsed, despite the unrepaired condition of the roof, if the porches had not fallen on it. We would note, however, that since the undisputed evidence shows plaintiff was either holding the property under the written lease at a rental of $250 a month or as a holdover tenant from year to year on the same terms (*Bellows v. Ziv* (1962), 38 Ill. App. 2d 342, 187 N.E.2d 265; 24 Ill. L. & Prac. *Landlord and Tenant* sec. 63 (1980)), it would seem that the only consideration for an increase in the rent could have been an agreement to repair the roof.

### III

The appellants also contended that the trial court erred in failing to grant a mistrial because of plaintiff's two references to insurance adjusters. One of the issues vigorously litigated below was whether the landlord had access to the garage. Speaking of Mayer, who was the landlord-owner some time before defendants, plaintiff testified:

"Q. Did you ever let Mr. Mayer in to inspect the inside of the warehouse?

A. Sure.

Q. Was that on more than one occasion?

A. Well, once, and then—once or twice; and he also had, I think an insurance man come to inspect, and I met the insurance man.

Q. Now, not talking about the insurance time, on the once or twice that Mr. Mayer went in, for what purpose was that?"

No objection was made at the time to these questions and answers.

Later on, speaking of Scott, plaintiff testified:

"A. It's [the key] available to him at any time he wanted. The store is open seven days a week.

Q. Did he, in fact, get access to the warehouse.

A. Anytime that he wanted access.

Q. And that would be for what purpose?

A. Well, if he had an insurance adjuster to look at it or for whatever purpose he wanted to look at it."

At this time appellants moved for a mistrial.

■■ ■ While the interjection of the fact a defendant has liability insurance is improper (*Marchlik v. Coronet Insurance Co.* (1968), 40 Ill. 2d 327, 239 N.E.2d 799), whether a mistrial should be granted is within the discretion of the trial court whose decision will not be disturbed in the absence of an abuse of discretion (*Behrens v. W. S. Bills & Sons, Inc.* (1972), 5 Ill. App. 3d 567, 283 N.E.2d 1; *Clarke v. Rochford* (1967), 79 Ill. App. 2d 336, 224 N.E.2d 679), and not every casual or inadvertent reference to a liability insurer will necessitate a mistrial. (*Imparato v. Rooney* (1981), 95 Ill. App. 3d 11, 419 N.E.2d 620, *appeal denied* (1981), 85 Ill. 2d 565; *Heiser v. Chastain* (1972), 6 Ill. App. 3d 552, 285 N.E.2d 601.) These rules are inapplicable here, however, for the simple reason that nowhere was there a reference to appellants' liability insurance. Both statements referred to an adjuster investigating property which was standing and locked and to which no loss had occurred for which appellants could be liable. The jury could only understand the statements as referring to property not liability insurance. That this was the way the jury did in fact understand them is shown by the fact it sent out a written inquiry asking if there was "any insurance reimbursement for loss [*sic*] merchandise." And since the references were not to liability insurance, there was no error. (*Tippit v. Hunter* (Miss. 1967), 205 So.2d 267.) Furthermore, the first reference was not even to appellants' insurance but to that of Mayer. It is well settled that reversal of a plaintiff's verdict is not required where plaintiff mentioned the fact of insurance, referring to one other than defendant's insurer. *Twait v. Olson* (1982), 104 Ill. App. 3d 191, 432 N.E.2d 1244; *Amberson v. Woodul* (Tex. Civ. App. 1937), 108

S.W.2d 852, *error dismissed*; *Moss v. Nehman* (Mo. App. 1952), 247 S.W.2d 305; 21B Appleman, Insurance Law & Practice sec. 12834 (1980).

In addition the defendants have not contended that the references to insurance were prejudicial—indeed, it is difficult to see how they could do so since they have not challenged the verdict as excessive or unsupported by the evidence. (See *Probus v. Brown* (1975), 33 Ill. App. 3d 639, 338 N.E.2d 231.) A reviewing court will not reverse unless an error affected the outcome below (*Baker v. Baker* (1952), 412 Ill. 511, 107 N.E.2d 711; *Lindroth v. Walgreen Co.* (1950), 407 Ill. 121, 94 N.E.2d 847), and the burden is on the party seeking reversal to establish prejudice. *In re Estate of Trampenau* (1980), 88 Ill. App. 3d 690, 410 N.E.2d 918; 3 Ill. L. & Prac. *Appeal and Error* sec. 802 (1953).

## IV

Appellants' last complaint is that the trial court refused to admit in evidence that portion of the plaintiff's tax return which the plaintiff produced "for such probative value as it may have had." During trial, apparently for the first time, since there is nothing in the record showing any previous demand, the appellants demanded plaintiff's tax returns for the year in question. All plaintiff's attorney could find at that time was Schedule C of the 1975 tax return. Plaintiff was fully examined on the contents of that page which apparently did not show any casualty loss. The trial court at the end of the case refused to allow the single page on the obvious ground that this was only one page of a many-page tax return; there was no expert testimony or any evidence submitted which would indicate that the loss was not taken in 1975 or in subsequent years pursuant to proper income tax procedure.

■■■ ■ The page in question is not part of the record on appeal and, therefore, this court must presume that the trial court was correct in its ruling. (*McNaught v. Plotkin* (1977), 52 Ill. App. 3d 548, 367 N.E.2d 708.) All purported errors must be preserved in the record to be reviewable (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533, *appeal denied* (1977), 66 Ill. 2d 631; 2 Ill. L. & Prac. *Appeal and Error* secs. 511, 526 (1953)), and the burden was on the appellants to preserve the record for review. Furthermore, since plaintiff was fully examined on the contents of the page, the admission of the document itself would have been merely cumulative evidence and no prejudice resulted from its exclusion. (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533, *appeal denied* (1977), 66 Ill. 2d 631; 3 Ill. L. & Prac. *Appeal and Error* sec. 825 (1953).) How-

ever, in this case the admission of the document would have been serious error since it would have disclosed irrelevant and prejudicial material and raised the suggestion that plaintiff was insured for the loss. Accordingly, the trial court was required to refuse to admit it into evidence.

Appellants contend in their brief that Schedule C reflected no casualty loss for the year 1975. In light of the fact that there is no denial that some loss occurred, the only probative value the omission of any claim for a casualty loss on a tax return could have would be to show that plaintiff was fully reimbursed for his loss by his insurance carrier. It is just as prejudicial to suggest the plaintiff is covered for the loss by property insurance as it is to suggest the defendant is protected by liability insurance. (21B Appleman, Insurance Law & Practice sec. 12841 (1980).) Appellants' attempt to suggest this to the jury was highly improper.

For the foregoing reasons, the judgment against Calvary Tabernacle Assembly of God is affirmed. Since Scott has apparently waived his individual rights, the judgment against him also is affirmed.

Judgment affirmed.

JOHNSON, P. J. and JIGANTI, J., concur.