*In re* DETENTION OF THOMAS TRAYNOFF (The People of the State of Illinois, Petitioner-Appellee, v. Thomas Traynoff, Respondent-Appellant).

Second District   No. 2—01—0880

Opinion filed May 8, 2003.

KAPALA, J., dissenting.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Lisa Madigan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor

General, and William L. Browers and Anne S. Bagby, Assistant Attorneys General, of counsel), and Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Respondent, Thomas Traynoff, appeals from a trial court order finding him to be a sexually violent person pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 1998)). On appeal, respondent argues that (1) the Act is unconstitutional under the United States Supreme Court's decision in *Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002); (2) the trial court erred in finding that respondent lacked control of his sexually violent behavior; and (3) the trial court erred in ordering respondent to submit to a mental evaluation by the Department of Human Services (DHS). In a supplemental brief, respondent also argues that the trial court erred in allowing expert testimony regarding certain actuarial instruments utilized to predict the likelihood that respondent would reoffend. We affirm in part and remand with directions.

On December 16, 1998, the State filed a petition to commit respondent pursuant to section 40 of the Act (725 ILCS 207/40 (West 1998)). The petition alleged as follows: on November 4, 1993, respondent, age 49, pleaded guilty to aggravated criminal sexual abuse. Respondent engaged in sexual intercourse with his girlfriend's niece, age 14. Prior to intercourse, respondent placed his penis on her vagina, his mouth on her vagina, his finger on her vagina, and his penis in her mouth. These acts were videotaped and occurred after respondent gave the girl alcohol until she became intoxicated. For this offense, respondent was sentenced to six years in prison.

Respondent's criminal history also included one conviction of unlawful delivery of a controlled substance, two convictions of burglary, one conviction of delivery of cannabis, and a federal conviction of possession of firearms. The six-year prison term imposed for unlawful delivery ran consecutive to the six-year term imposed for the sex offense involving the girlfriend's niece. In addition, respondent was sentenced to one year in a federal prison, consecutive to the above terms.

The petition further alleged that respondent was convicted twice of contributing to the sexual delinquency of a child. At age 22, he was sentenced to 364 days in jail. At age 24, respondent was sentenced to one year of probation and 90 days in jail.

According to the petition, respondent did not participate in sexual

offender treatment and suffered from mental disorders including paraphilia not otherwise specified, alcohol abuse, and antisocial personality disorder. The State alleged that respondent was dangerous to others because his mental disorders created a substantial probability that he would engage in further acts of sexual violence. A mental health evaluation, prepared by psychologist Dr. Jacqueline N. Buck, accompanied the petition.

On December 22, 1998, the court determined that there was probable cause to believe respondent was eligible for commitment. On January 11, 1999, Dr. Phil Reidda and Dr. Paul Heaton, DHS psychologists, attempted to evaluate respondent pursuant to the Act. Respondent, however, refused to participate in the evaluation process. On February 10, 1999, the State filed a motion to compel respondent to submit to a mental evaluation. On May 27, 1999, the court granted the State's motion to compel respondent to cooperate with DHS psychologists. Respondent's request for appointment of an independent psychologist to evaluate him was also granted.

A bench trial commenced on June 7, 2000. DHS psychologist Dr. Buck testified that respondent suffered from three mental disorders: (1) paraphilia not otherwise specified; (2) alcohol abuse; and (3) severe antisocial personality disorder with narcissistic features. Dr. Buck defined paraphilia as a sexual disorder in which an individual is sexually aroused in a deviant manner by persons or things. Dr. Buck found respondent to be sexually attracted to minor females. Dr. Buck also found that respondent showed no remorse for his criminal conduct, failed to accept blame for it, and transferred blame instead to the victim. Dr. Buck opined that, if respondent were released, he would be at high risk to reoffend with acts of sexual violence.

Dr. Buck based her opinion, in part, on two actuarial instruments known as the Minnesota Sex Offender Screening Tool-Revised (MnSost-R) and the Static 99. Dr. Buck testified that a landmark study developed by Dr. Hanson in 1996, referred to as a "meta-analysis," identified risk factors that distinguish sex offenders who reoffend from those who do not. Dr. Buck further testified that, because the meta-analysis does not provide a percentage of risk of sexual reoffense, actuarial tools such as the MnSost-R, the Static 99, and the Rapid Risk Assessment of Sexual Offense (RRASOR) were developed to weight the risk factors and predict the likelihood of sexual offender recidivism.

The Static 99, also developed by Dr. Hanson, contains 10 factors designed to assess the probability that a sexual offender will reoffend. Using the Static 99, Dr. Buck scored respondent an 8, which put him in the high risk category. When asked whether Static 99 is reasonably

relied upon by members of the field, Dr. Buck stated that it was a "work in progress" but strongly relied upon. Dr. Buck indicated that the predictive accuracy of this instrument was moderately high.

The second actuarial tool utilized by Dr. Buck was the MnSost-R, which contains 16 factors designed to predict the probability percentage of sexual recidivism. Using the MnSost-R, Dr. Buck determined that there was a 92% probability that respondent would reoffend.

On cross-examination, Dr. Buck admitted that the risk factors listed in Dr. Hanson's meta-analysis in 1996 had changed due to more research and studies in 1998. In 1996, Dr. Hanson found that factors such as low self-esteem, anger, denial, and general life stress did not impact the rate of recidivism. Dr. Buck explained that the reason she used these factors to evaluate respondent was that the 1996 study was out of date in some aspects and that Dr. Hanson had changed his mind about a number of things since that time.

When asked why she did not utilize the Rapid Risk Assessment of Sexual Offense (RRASOR), Dr. Buck responded that Dr. Hanson, who had created the instrument, now discouraged its use. She further testified that she could not, in good faith, apply a four-item test to predict recidivism. Dr. Buck also testified that she considered the MnSost-R to be more reliable than the RRASOR. She stated that "that's what makes this field exciting because you have folks duking it out over the subtleties."

Based on her clinical opinion, her experience, her clinical judgment, plus the actuarial tools, Dr. Buck opined that respondent was dangerous due to mental disorders making it substantially probable that he would commit future acts of sexual violence.

The State also called Dr. Paul Heaton, a private practitioner whose professional group did psychological evaluations for the DHS in similar cases. Dr. Heaton determined that respondent's IQ was in the high to superior range. He also concluded that respondent had a pattern of chronic psychic maladjustment, including severe defensiveness, suspicion, insecurity, evasiveness, and narcissistic personality traits. Dr. Heaton found that respondent was in strong denial of wrongdoing and had little empathy for the victim. Dr. Heaton's diagnosis matched that of Dr. Buck, and he also noted that respondent had not participated in any treatment program. Dr. Heaton opined that respondent's mental disorders predisposed him to commit more acts of sexual violence.

In forming his assessment, Dr. Heaton utilized the RRASOR and MnSost-R. Dr. Heaton explained that actuarial tools were screening devices that a layperson could use without advanced training or special licensing. These instruments could also be used without any personal

interview with the subject. Dr. Heaton stated that the RRASOR was a very quick way of assessing a person's potential for reoffense with only four factors. Dr. Heaton also stated that he had some concern over the limited nature of the tool since several factors had now been added to it. Using the RRASOR, Dr. Heaton scored respondent a four, which indicated that there was a 33% probability that respondent would reoffend.

Dr. Heaton also utilized the MnSost-R when it became available because he wanted to make sure that the results that he had obtained from the RRASOR had not changed significantly due to new information in the field. According to Dr. Heaton, the MnSost-R had been cross-validated and was considered a state-of-the-art study. Dr. Heaton scored respondent a 16 on the MnSost-R, which put him in the high risk category.

Dr. Heaton stated that he would never rely on actuarial studies alone and that they were a way to support or corroborate the information obtained through other means. Based on his interview with respondent, his professional experience and education, as well as the actuarial tools, Dr. Heaton opined that respondent's mental disorders made it substantially probable that he would reoffend.

Defense witness Dr. Timothy Brown, a clinical psychologist and director of the Kane County Diagnostic Center, reviewed the reports of Drs. Buck and Heaton and diagnosed respondent as suffering from an adult antisocial behavior disorder and paraphilia not otherwise specified. Dr. Brown testified that respondent did not accept full responsibility for his criminal acts. While Dr. Brown concluded that there was no substantial probability that respondent would reoffend as a result of his mental disorders, he acknowledged that he was not experienced in performing risk assessments under the Act. Dr. Brown also admitted that he did not access all of the information reviewed by Drs. Buck and Heaton. Dr. Brown opined that respondent posed a moderate risk to reoffend.

Dr. Brown utilized the RRASOR and the MnSost-R in order to assess respondent. Using the RRASOR, Dr. Brown scored respondent a four, which indicated that there was a 33% probability that respondent would reoffend. Using the MnSost-R, Dr. Brown determined that there was a 42% probability that respondent would reoffend, putting him in the moderate risk category.

Dr. Brown testified that there was controversy within the field regarding the use of actuarial tools to predict sexual recidivism. Dr. Brown stated that they were not tests but research instruments, meaning that there were no manuals to accompany them. Dr. Brown further stated that, although they could be used to buttress testimony, they

could not definitively determine whether a person should be committed under the Act.

On October 16, 2000, respondent was found to be a sexually violent person pursuant to the Act. Following a dispositional hearing on July 18, 2001, the court ordered that respondent be released based upon compliance with numerous conditions. Respondent filed a timely notice of appeal.

Respondent first argues that the Act is unconstitutional because it is contrary to the due process standard established by the Supreme Court in *Crane*. Specifically, respondent contends that the Act is unconstitutional because it allows the civil commitment of a person as sexually violent without a finding that the person lacks control over his or her behavior. Respondent relies on the language in *Crane*, which states that "there must be proof of serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. For the reasons that follow, we find the Act constitutional as applied to respondent.

Before *Crane*, in *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), the Supreme Court made clear that due process requires at least two findings to be made before a sex offender may be committed under a civil commitment statute: a finding of dangerousness linked with the existence of a mental illness or mental abnormality. *Hendricks*, 521 U.S. at 358, 138 L. Ed. 2d at 512-13, 117 S. Ct. at 2080. In *Crane*, the Supreme Court then stated that there "must be proof of serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. While the Court stated that "*Hendricks* set forth no requirement of *total* or *complete* lack of control," the Court made it clear that the Constitution does not permit commitment "without *any* lack-of-control determination." (Emphasis in original.) *Crane*, 534 U.S. at 411-12, 151 L. Ed. 2d at 861-62, 122 S. Ct. at 870.

The question necessarily raised by *Crane* is whether a specific finding is required regarding a person's ability to control his or her sexually violent conduct. The State argues that *Crane* requires no specific finding. Specifically, the State contends that the Act is constitutional because the definition of "mental disorder" impliedly includes a finding regarding a lack of control.

■ According to the Act, a "sexually violent person" is "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 1998). A "mental disorder" is then defined as a "congenital or acquired condition affecting the emotional

or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 1998).

The State cites various cases to support its position that *Crane* does not require a specific determination regarding a lack of control. For example, in *People v. Hancock*, 329 Ill. App. 3d 367, 375 (2002), the court held that no specific jury finding was required that defendant had serious difficulty in controlling his behavior. Likewise, *In re Detention of Isbell*, 333 Ill. App. 3d 906, 912 (2002), held that *Crane* does not require a specific jury determination in every case. Both cases relied on our supreme court's opinion in *In re Detention of Varner*, 198 Ill. 2d 78, 84-85 (2001), which upheld the constitutionality of the Act but required no specific finding regarding a respondent's ability to control his sexually violent conduct.

However, *Varner* is no longer settled law. Not long ago, the United States Supreme Court issued an order vacating our supreme court's judgment and remanding the cause for further consideration in light of *Crane*. *Varner v. Illinois*, 537 U.S. 802, 154 L. Ed. 2d 3, 123 S. Ct. 69 (2002) (mem.). As a result, it is unclear at this point how *Crane* will be interpreted by our supreme court.

Even if *Crane* is interpreted to require a specific determination regarding a lack of control, such a finding was made in the case before us. In its written ruling on the "sexually violent" petition, the trial court made an explicit finding that respondent was not able to control his sexually violent conduct in an unstructured environment. Therefore, we find the Act constitutional as applied to respondent. Having found the Act constitutional as applied, we need not consider whether the Act is constitutional on its face. Courts are not to compromise the stability of the legal system by declaring legislation unconstitutional when a particular case does not require it. *Trent v. Winningham*, 172 Ill. 2d 420, 425 (1996). This is true because existing legislation enjoys a presumption of constitutional validity, and courts operate only in the context of resolving lawsuits. *Winningham*, 172 Ill. 2d at 425-26.

As a final matter, we note that this court recently upheld the Act's constitutionality in *People v. Swanson*, 335 Ill. App. 3d 117, 122 (2002). In *Swanson*, we stated that, even though the Act does not explicitly mandate a determination regarding a person's ability to control himself or herself, it does provide that the State must prove that the person suffers from a mental disorder that affects the person's ability to control his or her conduct. *Swanson*, 335 Ill. App. 3d at 122. We concluded that the Act sufficiently "narrows 'the class of persons eligible for confinement to those who are unable to control their dangerousness.' " *Swanson*, 335 Ill. App. 3d at 123, quoting *Hendricks*, 521 U.S. at 358, 138 L. Ed. 2d at 513, 117 S. Ct. at 2080.

We are not obligated in this case, for the reasons stated above, to determine whether the Act is constitutional on its face. Until *Varner* is decided by our supreme court, the effect of *Crane* remains unclear. Nevertheless, because the trial court made a specific finding that respondent was not able to control his sexually violent behavior, we find the Act constitutional as applied.

■ Respondent's second argument is that the evidence does not support a finding that he lacked the ability to control his sexually violent behavior as required under *Crane*. "On review, we ask only whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could find that the elements of the offense have been proved beyond a reasonable doubt." *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 11 (2001).

■ Respondent initially argues that there is no evidence in the record to show that he has serious difficulty in controlling his behavior. Respondent bases this argument on the testimony of Drs. Buck and Heaton that respondent committed these offenses with volition. Respondent apparently takes the position that because he committed these acts with volition, the State has not proved that he lacks control over his sexually violent behavior. For the following reasons, we find this argument to be without merit.

First, as we have stated, it is clear that *Crane* requires at least some lack-of-control determination. *Crane*, 534 U.S. at 412, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. Here, the trial court satisfied this requirement by specifically finding that respondent was not able to control his sexual conduct in an unstructured environment. The trial court's written ruling on the "sexually violent person" petition stated:

> "I find from considering all of the testimony, including that which established Respondent's refusal to undergo treatment, his denial of self blame, his placing blame on the victim, and the nature of his mental illness, that he is not able to control his sexual conduct in an unstructured environment."

Second, we find sufficient evidence in the record to support the trial court's finding. First, State expert Dr. Buck testified that respondent showed no remorse for his criminal conduct, failed to accept blame for it, and transferred blame instead to the victim. Dr. Buck also found that respondent suffered from paraphilia not otherwise specified, alcohol abuse, and severe antisocial personality disorder, with narcissistic features. Applying her findings of respondent's traits to accepted actuarial studies, Dr. Buck found respondent to be at a high risk to reoffend. In sum, Dr. Buck opined that, to a reasonable degree of psychological certainty, respondent was dangerous due to mental disorders making it substantially probable that he would commit future acts of sexual violence.

Consistent with Dr. Buck's findings, State expert Dr. Heaton found that respondent was in strong denial of wrongdoing and had little empathy for the victim. Dr. Heaton's diagnosis matched that of Dr. Buck, and Dr. Heaton noted that respondent had not participated in any treatment program. Dr. Heaton testified that, to a reasonable degree of psychological certainty, respondent's mental disorders rendered it substantially probable that he would reoffend and commit further acts of sexual violence.

Finally, defense expert Dr. Brown diagnosed respondent as suffering from adult antisocial behavior and paraphilia not otherwise specified. While Dr. Brown concluded that there was no substantial probability that respondent would reoffend as a result of his mental disorders, he testified that respondent did not accept full responsibility for his criminal acts. In addition, Dr. Brown acknowledged that he was not experienced in performing risk assessments under the Act and that he did not access all of the information reviewed by Drs. Buck and Heaton. Dr. Brown concluded that respondent posed a moderate risk to reoffend.

After careful review of the record, we conclude that sufficient evidence exists to support the trial court's determination that respondent is a sexually violent person. Three experts testified as to respondent's mental disorders and risk for reoffending. All three agreed that respondent suffered from paraphilia not otherwise specified and posed a risk to reoffend. In sum, we find that the testimony of the three experts and the nature of respondent's mental disorders, in conjunction with his refusal to undergo treatment, his denial of self-blame, and his placing blame on the victim, established proof beyond a reasonable doubt that respondent lacked the ability to control his sexually violent behavior.

Testimony that respondent committed these acts of sexual violence with volition does not prevent commitment under the Act. In no way do we interpret *Crane* as yielding such an absurd result. If we were to adopt such a position, all persons subject to commitment would escape such a finding by declaring all of their past criminal conduct to be volitional. Under that view, commitment would result only when a person confessed to an inability to control his sexually violent behavior, as was the case in *Hendricks*. *Hendricks*, 521 U.S. at 360, 138 L. Ed. 2d at 514, 117 S. Ct at 2081. We decline to interpret *Crane* in such a restrictive manner. Rather, as *Crane* illustrates, the Constitution's safeguards of human liberty in the area of mental illness and the law are not best enforced through precise, bright-line rules. *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 863, 122 S. Ct. at 870. The Court explained:

"And we recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862-63, 122 S. Ct. at 870.

For the reasons stated earlier, we find there is sufficient evidence to support the trial court's determination that respondent lacked control of his sexually violent behavior.

█ Respondent also asserts that, because the trial court incorrectly stated that he was diagnosed as a pedophile, his adjudication as a sexually violent person should be reversed. We disagree.

Parties are not entitled to error-free trials, but to fair trials, free of substantial prejudice. *Perry v. Murtagh*, 278 Ill. App. 3d 230, 240 (1996). Not every error committed by the trial court in a civil case leads to reversal; rather, there must be some showing that the appellant has been prejudiced by that error, and reversal is required only where it appears that the outcome might have been different had the error not occurred. *In re Marriage of Wilder*, 122 Ill. App. 3d 338, 344-45 (1983). The burden is on the party seeking reversal to establish prejudice. *Goldstein v. Scott*, 108 Ill. App. 3d 867, 879 (1982).

We do not believe that the misstatement of the trial court in this case warrants reversal. As respondent concedes, in its initial written ruling on the "sexually violent person" petition, the trial court correctly referred to respondent's diagnosis as "paraphilia not otherwise specified." In that ruling, the trial court made no mistake as to respondent's mental disorder, referring to it at all times as paraphilia. It was not until the court's ruling on respondent's motion for a new trial that the court misstated respondent's diagnosis as pedophilia. Therefore, the court relied on the correct diagnosis in its original ruling finding respondent to be a sexually violent person within the meaning of the Act. As a result, we do not believe that respondent was prejudiced or that the outcome would have been different had the trial court not made this misstatement. Where it appears that the error does not affect the outcome below, or where the court can see from the record that no injury has been done, the judgment will not be disturbed. *In re Estate of LaCasse*, 265 Ill. App. 3d 847, 854 (1994). In sum, we find that the misstatement did not deprive respondent of a

fair trial. Accordingly, we affirm the trial court's determination that respondent is a sexually violent person.

Respondent's next argument is that the trial court erred when it ordered him to submit to an evaluation by the DHS. Respondent maintains that because this issue was raised in his posttrial motion, it was preserved for appellate review. The State contends that this issue is waived because respondent did not object to the motion during the proceedings.

■ As a general rule in civil cases, the failure to specifically and timely object waives the objection for purposes of review. *Rice v. Merchants National Bank*, 213 Ill. App. 3d 790, 798 (1991). As respondent concedes, he did not object to the order compelling him to submit to a DHS evaluation at the time of the proceedings. However, waiver is an admonition to the parties rather than a limitation on the reviewing court's jurisdiction, and it may be relaxed in order to maintain a uniform body of precedent or where the interests of justice so require. *American Federation of State, County & Municipal Employees, Council 31 v. County of Cook*, 145 Ill. 2d 475, 480 (1991). Given that respondent raised the issue in his posttrial motion and argues it at length on appeal, we find that the interests of justice require our review of this issue.

Respondent contends that the trial court erred by compelling him to submit to a DHS evaluation. Specifically, respondent argues that the order (1) violated his right to remain silent pursuant to section 25(c)(2) of the Act (725 ILCS 207/25(c)(2) (West 1998)); and (2) was contrary to section 30(c) of the Act (725 ILCS 207/30(c) (West 1998)). For the following reasons, we reject both of these arguments.

■ The resolution of both issues hinges upon the interpretation of the Act. Therefore, our review is *de novo. Department of Public Aid v. Brewer*, 183 Ill. 2d 540, 554 (1998).

Section 25(c)(2) states:

"Except as provided in paragraph (b)(1) of Section 65 and Section 70 of this Act, at any hearing conducted under this Act, the person who is the subject of the petition has the right to:
\*\*\*
(2) Remain silent." 725 ILCS 207/25(c)(2) (West 1998).

■ Respondent argues that the evaluation compelled by the court violated his right to remain silent. However, this court has held that the right to remain silent applies only during any hearing held after the filing of a petition. *In re Detention of Anders*, 304 Ill. App. 3d 117, 121 (1999). It is clear that the legislature's use of the phrase "at any hearing" was meant to limit the scope of this protection to "hearings." *Anders*, 304 Ill. App. 3d at 121. Interpreting section 25 of the

Act as affording a person the right to remain silent during an evaluation ignores the clear language of the statute. *Anders*, 304 Ill. App. 3d at 121. Therefore, we hold that the court's order compelling respondent to submit to an evaluation by the DHS did not violate respondent's right to remain silent under section 25(c)(2) of the Act.

■ Likewise, we reject the argument that respondent had the right to refuse to cooperate with the DHS evaluation under section 30(c) of the Act (725 ILCS 207/30(c) (West 1998)). Section 30(c) states, in pertinent part:

> "If the court determines after a hearing that there is probable cause to believe that the person named in the petition is a sexually violent person, the court shall order that the person be taken into custody if he or she is not in custody and shall order the person to be transferred within a reasonable time to an appropriate facility for an evaluation as to whether the person is a sexually violent person. If the person named in the petition refuses to speak to, communicate with, or otherwise fails to cooperate with the expert from the Department of Human Services who is conducting the evaluation, the person shall be prohibited from introducing testimony or evidence from any expert or professional person who is retained or court appointed to conduct an evaluation of the person." 725 ILCS 207/30(c) (West 1998).

Apparently, respondent interprets section 30(c) of the Act as giving a person the right to remain silent at evaluations. We disagree. As the court stated in *In re Detention of Tiney-Bey*, 302 Ill. App. 3d 396, 402 (1999), "a respondent has the power, but not the right, to refuse to comply with an evaluation." Section 30(c) of the Act "merely addresses the practical problems that may arise because of this and does not imply a right to remain silent." *Tiney-Bey*, 302 Ill. App. 3d at 402.

■ Respondent also argues that the ruling deprived him of a trial strategy, causing his trial to be unfair. When the court granted the State's motion to compel respondent to submit to a DHS evaluation, the court also granted respondent's request for appointment of an expert. Respondent, however, argues that had he been able to refuse cooperation with the DHS, and thereby forgo his own expert, the trial may have yielded a different outcome. Respondent relies on two cases decided by this court to support his argument.

The intent of the statute is to prevent either the State or the respondent from having an evidentiary advantage and to guarantee that both parties have the opportunity to present evidence substantially equal in character. *In re Detention of Trevino*, 317 Ill. App. 3d 324, 330 (2000). In *In re Detention of Kortte*, 317 Ill. App. 3d 111, 116 (2000), we concluded that the respondent was denied a level playing

field because the State had the opportunity to call two nonexamining expert witnesses, while the respondent was barred from calling a nonexamining expert of his own. Similarly, in *Trevino*, we held that the respondent's right to due process was violated because the State was able to present one examining and one nonexamining expert witness, while the respondent was able to present only one nonexamining expert. *Trevino*, 317 Ill. App. 3d at 331.

The circumstances in *Kortte* and *Trevino* are not present here. As respondent concedes, the court granted his request for appointment of an expert. As a result, the State was able to present two examining expert witnesses and respondent was able to present one examining expert witness. Because both sides were able to call examining experts, neither party had an evidentiary advantage and both parties had the opportunity to present evidence substantially equal in character. Therefore, the court's application of section 30(c) in this case did not deny respondent due process.

Respondent's final argument, raised in a supplemental brief, is that it was error to allow expert testimony regarding certain actuarial instruments utilized to predict the likelihood that respondent would reoffend. Specifically, respondent maintains that the RRASOR, MnSost-R, and Static 99 fail the test for admissibility as articulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Respondent relies on a case recently decided by this court which held that psychological or psychiatric testimony of an expert predicated upon actuarial instruments is scientific evidence subject to *Frye*. *People v. Taylor*, 335 Ill. App. 3d 965, 976 (2002).

The State maintains that respondent waived this issue because he never objected to the experts' testimony at trial or in a posttrial motion. Respondent, however, asserts that this issue should be considered under the doctrine of plain error.

The plain error analysis applies where the defendant has failed to make a timely objection. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). In this situation, " '[i]t is the defendant rather than the [State] who bears the burden of persuasion with respect to prejudice.' " *Thurow*, 203 Ill. 2d at 363, quoting *United States v. Olano*, 507 U.S. 725, 734, 123 L. Ed. 2d 508, 520, 113 S. Ct. 1770, 1778 (1993). Plain error is a limited and narrow exception to the general waiver rule and is invoked only where the evidence is closely balanced or where the alleged error is so substantial that it deprived the defendant of a fair trial. *People v. Kuntu*, 196 Ill. 2d 105, 128 (2001).

Illinois courts follow the *Frye* test in determining the admissibility of expert testimony based on novel scientific evidence. *Frye*, 293 F. 1013; *Donaldson v. Central Illinois Public Service Co.*, 199 Ill.

2d 63, 77 (2002). The "general acceptance" test articulated in *Frye* provides that scientific evidence is admissible only if the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs. *Frye*, 293 F. at 1014; *Donaldson*, 199 Ill. 2d at 77 (2002). In determining what constitutes "general acceptance," the question is whether there is consensus versus controversy over a particular technique. *Taylor*, 335 Ill. App. 3d at 977, citing *Donaldson*, 199 Ill. 2d at 78.

█ In *Taylor*, we noted that several Illinois courts have held that *Frye* should govern the admissibility of psychological and psychiatric expert testimony that is not predicated solely on the evaluator's own clinical observation and experience. *Taylor*, 335 Ill. App. 3d at 973. Consequently, we held that the State is obligated to satisfy the *Frye* test before an expert's testimony predicated upon actuarial instruments is admitted. *Taylor*, 335 Ill. App. 3d at 973. Specifically, *Taylor* found that the MnSost-R, RRASOR, and Static 99 constitute scientific evidence subject to the *Frye* test. *Taylor*, 335 Ill. App. 3d at 973.

█ In the case at bar, all three experts testified that they relied, at least in part, on the MnSost-R, RRASOR, and Static 99 in finding respondent to be a sexually violent person under the Act. Therefore, their assessments of respondent's risk for reoffending were not predicated solely upon their clinical judgment, training, and expertise. In addition, there was no determination under *Frye* in this case regarding the general acceptance of using these actuarial tools to measure the likelihood of reoffense.

We also note that all three experts testified that they had concerns regarding the use of these instruments. State expert Dr. Buck indicated that she would not utilize the RRASOR because of its limited capacity (only four questions). She also indicated that Dr. Hanson, a primary leader in the field, had changed several of the risk factors identified in the 1996 meta-analysis due to further research and study. Similarly, State expert Dr. Heaton testified that, although he used the RRASOR to assess respondent, he also had concerns regarding its reliability. Finally, Dr. Brown indicated that there was controversy within the field regarding the overall use of actuarial tools to predict sexual recidivism. He expressed concern because there were no manuals to accompany these instruments.

For all of the above reasons, we find that plain error occurred in this case. In other words, we believe respondent has satisfied his burden of showing that he was prejudiced by the admission of the experts' testimony predicated upon the MnSost-R, RRASOR, and Static 99. As noted above, all three experts relied, in part, on the

actuarial tools to predict respondent's likelihood of reoffense. However, on the basis of the record before us, it is unclear whether these instruments are still in the experimental stages or whether their validity has been established.

Because the trial court is in the best position to make a determination regarding the admissibility of these instruments, we remand this case to the trial court to conduct a *Frye* hearing. Specifically, we direct the trial court to conduct a *Frye* hearing to determine the admissibility of the MnSost-R, RRASOR, and Static 99. If it is determined that these actuarial tools satisfy the standard set forth in *Frye*, then the judgment of the trial court is affirmed. If, however, the State fails to meet its burden to show that the MnSost-R, RRASOR, and Static 99 have gained general acceptance from the psychological and psychiatric communities, then the judgment of the trial court is reversed and the case is remanded for a new trial.

For the reasons stated, the order of the circuit court of Kane County compelling respondent to submit to a DHS evaluation is affirmed and the cause is remanded with directions to conduct a *Frye* hearing to determine the admissibility of the MnSost-R, RRASOR, and Static 99 and for further proceedings in accordance with this opinion.

Order affirmed; cause remanded with directions.

HUTCHINSON, P.J., concurs.

JUSTICE KAPALA, dissenting:

Respondent concedes that he waived his right to challenge for the first time on appeal the admissibility of the testimony of the State's experts regarding their use of three actuarial instruments: the RRASOR, the MnSOST-R, and the Static 99. I respectfully dissent from that portion of the majority opinion which circumvents waiver by concluding that it was plain error to admit expert testimony regarding the use of those three instruments.

Plain error is a limited and narrow exception to the general waiver rule, to be invoked only when the evidence is closely balanced or the alleged error is so substantial that it denied the defendant a fair trial. *People v. Kuntu*, 196 Ill. 2d 105, 128 (2001). It is the defendant who has the burden of showing plain error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003).

In this case, the evidence was not closely balanced on the issue of respondent being a sexually violent person. Respondent had a history of prior sex offenses. The evidence also showed he denied wrongdoing, refused to undergo treatment, and placed blame on the victims. More

importantly, both State experts, relying on information separate from the actuarial instruments, opined he was a sexually violent person who had a high risk of reoffending in the future. Dr. Buck based her opinion on her clinical assessment of respondent, his past history, and her experience. Dr. Heaton relied on similar information to reach his opinion. Even respondent's own expert, Dr. Brown, diagnosed respondent as suffering from adult antisocial behavior and paraphilia. He also testified that respondent did not accept full responsibility for his acts. Moreover, he conceded respondent posed a "moderate risk to reoffend." I simply cannot conclude, in light of this evidence showing the seriousness of respondent's sexual disorder and his likelihood of reoffending, that the evidence was so closely balanced as to justify imposition of the plain error doctrine.

I also do not consider the error in allowing the experts to testify regarding the actuarial instruments to be so substantial that it deprived respondent of a fair trial. This second prong of the plain error exception is to be invoked only where the possible error is so serious that its consideration is necessary to preserve the integrity and reputation of the judicial process. *Kuntu*, 196 Ill. 2d at 128.

Here, the reliance by the State's experts on the actuarial instruments was, at best, insubstantial. Dr. Buck utilized the Static 99 and MnSOST-R but not the RRASOR. Dr. Heaton utilized the RRASOR and the MnSOST-R but not the Static 99. Further, their use of these instruments played a minimal role, if any, in reaching their ultimate opinions as to respondent's likelihood of reoffending.

Dr. Buck testified that she had already formulated her opinion that respondent qualified as a sexually violent offender before utilizing the actuarial instruments. She also stated on redirect examination that the two instruments "simply confirmed [her] clinical opinion" and that she would never form an opinion of the probability of someone committing future acts of sexual violence based on actuarial studies alone.

In a similar vein, Dr. Heaton testified, with no mention of actuarial instruments, that based on his evaluation and experience he believes respondent suffers from paraphilia and other psychological disorders that predispose him to commit acts of sexual violence. As for the RRASOR and the MnSOST-R, Dr. Heaton testified that they do not reflect a particular individual's risk of reoffending, but merely place a person in a category of people who have a certain risk of committing sex offenses. According to Dr. Heaton, he would never form an opinion of someone's risk to reoffend based on an actuarial study alone because it is only a screening tool and there are a "number of other significant risk factors" and "all kinds of information" that must be considered.

Dr. Heaton conceded that in respondent's case, the RRASOR is not an accurate indicator because it underestimates respondent's risk to reoffend based on the additional information that indicates his risk is much greater. Dr. Heaton added that it is not good practice to rely solely on a combination of actuarial instruments, and they should only be compared to the independent assessment of an individual.

It is worth noting that this case involves more than just respondent neglecting to object to the State's experts' testimony regarding the actuarial instruments. Respondent's own expert, Dr. Brown, used the RRASOR and the MnSOST-R to evaluate respondent and incorporated the results in his testimony on behalf of respondent.

It is evident when the record is viewed in its entirety that any error in admitting testimony regarding the use of the three actuarial instruments at issue in this case was not so substantial as to have deprived respondent of a fair trial. It is clear that the State's experts limited their use of the actuarial instruments as a method of cross-reference. They also stated unequivocally that they did not use the actuarial instruments to formulate their opinions but, rather, to confirm them. Based on the three experts' explanations of the limited purpose of the actuarial instruments, it would seem unlikely the trial court placed much, if any, weight on the use of those instruments in reaching its finding that respondent is a sexually violent person. Under the facts of this case, I would not find plain error and would, therefore, affirm the order of the circuit court.