No. 2--01--0880     

______________________________________________________________________________

IN THE 

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

 

In re
 DETENTION OF THOMAS   ) Appeal from the Circuit Court

TRAYNOFF
   ) of Kane County.

                                   )

                                 ) No. 98--MR--456

                                     )

(The People of the State of Illinois,   ) Honorable

Petitioner-Appellee, v. Thomas           ) Philip L. DiMarzio,

Traynoff, Respondent-Appellant).     ) Judge, Presiding.

______________________________________________________________________________

JUSTICE BOWMAN delivered the opinion of the court:

Following a bench trial in the circuit court of Kane County, respondent, Thomas Traynoff, was found to be a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 
et seq.
 (West 1998)).  Respondent appealed, arguing that (1) the Act is unconstitutional under the United States Supreme Court's decision in 
Kansas v. Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002); (2) the trial court erred in finding that respondent lacked control of his sexually violent behavior; and (3) the trial court erred in ordering respondent to submit to a mental evaluation by the Department of Human Services (DHS).  In a supplemental brief, respondent also argued that the trial court erred in allowing expert testimony regarding certain actuarial instruments utilized to predict the likelihood that respondent would reoffend.  

In an opinion dated May 8, 2003, this court held that the Act was constitutional as applied to respondent and that sufficient evidence existed to support the finding that respondent is a sexually violent person.  See 
People v. Traynoff
, 338 Ill. App. 3d 949, 957-60 (2003).  However, with one
 
justice dissenting, we remanded the case to the trial court with directions to conduct a 
Frye
 hearing (
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923))
 to determine the admissibility of the actuarial instruments used to measure the likelihood of reoffense.  
Traynoff
, 338 Ill. App. 3d at 965.
  We stated that, if the actuarial tools satisfied the standard set forth in 
Frye
, then the judgment of the trial court would be affirmed.  
Traynoff
, 338 Ill. App. 3d at 965.  Conversely, if the State failed to show that the instruments have gained general acceptance from the psychological and psychiatric communities, then the judgment would be reversed and respondent would be entitled to a new trial.  
Traynoff
, 338 Ill. App. 3d at 965.

Both respondent and the State sought leave to appeal to the supreme court.  Although these petitions were denied, on March 30, 2005, the supreme court directed us to vacate our opinion and reconsider our judgment in light of 
In re Commitment of Simons
, 213 Ill. 2d 523 (2004).  In 
Simons
, the supreme court held that "actuarial risk assessment" 
is generally accepted by professionals who assess sexually violent offenders; therefore, it is perfectly admissible in a court of law.  
Simons
, 213 Ill. 2d at 535.  
Given the supreme court's decision in 
Simons
, we affirm the judgment of the trial court. 

I.  BACKGROUND

On December 16, 1998, the State filed a petition to commit respondent pursuant to section 40 of the Act (725 ILCS 207/40 (West 1998)).  The petition alleged as follows: on November 4, 1993, respondent, age 49, pleaded guilty to aggravated criminal sexual abuse.  Respondent engaged in sexual intercourse with his girlfriend's niece, age 14.  Prior to intercourse, respondent placed his penis on her vagina, his mouth on her vagina, his finger on her vagina, and his penis in her mouth.  These acts were videotaped and occurred after respondent gave the girl alcohol until she became intoxicated.  For this offense, respondent was sentenced to six years in prison.                                    Respondent's criminal history also included one conviction of unlawful delivery of a controlled substance, two convictions of burglary, one conviction of delivery of cannabis, and a federal conviction of possession of firearms.  The six-year prison term imposed for unlawful delivery ran consecutive to the six-year term imposed for the sex offense involving the girlfriend's niece.  In addition, respondent was sentenced to one year in a federal prison, consecutive to the above terms.    The petition further alleged that respondent was convicted twice of contributing to the sexual delinquency of a child.  At age 22, he was sentenced to 364 days in jail.  At age 24, respondent was sentenced to one year of probation and 90 days in jail.    

According to the petition, respondent did not participate in sexual offender treatment and suffered from mental disorders including paraphilia not otherwise specified, alcohol abuse, and antisocial personality disorder.  The State alleged that respondent was dangerous to others because his mental disorders created a substantial probability that he would engage in further acts of sexual violence.  A mental health evaluation, prepared by psychologist Dr. Jacqueline N. Buck, accompanied the petition.

On December 22, 1998, the court determined that there was probable cause to believe respondent was eligible for commitment.  On January 11, 1999, Dr. Phil Reidda and Dr. Paul Heaton, DHS psychologists, attempted to evaluate respondent pursuant to the Act.  Respondent, however, refused to participate in the evaluation process.  On February 10, 1999, the State filed a motion to compel respondent to submit to a mental evaluation.  On May 27, 1999, the court granted the State's motion to compel respondent to cooperate with DHS psychologists.  Respondent's request for appointment of an independent psychologist to evaluate him was also granted.  

A bench trial commenced on June 7, 2000.  DHS psychologist Dr. Buck testified that respondent suffered from three mental disorders: (1) paraphilia not otherwise specified; (2) alcohol abuse; and (3) severe antisocial personality disorder with narcissistic features.  Dr. Buck defined paraphilia as a sexual disorder in which an individual is sexually aroused in a deviant manner by persons or things.  Dr. Buck found respondent to be sexually attracted to minor females.  Dr. Buck also found that respondent showed no remorse for his criminal conduct, failed to accept blame for it, and transferred blame instead to the victim.  Dr. Buck opined that, if respondent were released, he would be at high risk to reoffend with acts of sexual violence.  

Dr. Buck based her opinion, in part, on two actuarial instruments known as the Static 99 and the Minnesota Sex Offender Screening Tool-Revised (MnSost-R).  Dr. Buck testified that a landmark study developed by Dr. Hanson in 1996, referred to as a "meta-analysis," identified risk factors that distinguish sex offenders who reoffend from those who do not.  Dr. Buck further testified that, because the meta-analysis does not provide a percentage of risk of sexual reoffense, actuarial tools such as the Static 99, the MnSost-R, and the Rapid Risk Assessment of Sexual Offense (RRASOR) were developed to weight the risk factors and predict the likelihood of sexual offender recidivism.    The Static 99, also developed by Dr. Hanson, contains 10 factors designed to assess the probability that a sexual offender will reoffend.  Using the Static 99, Dr. Buck scored respondent an 8, which put him in the high risk category.  When asked whether Static 99 is reasonably relied upon by members of the field, Dr. Buck stated that it was a "work in progress" but strongly relied upon.  Dr. Buck indicated that the predictive accuracy of this instrument was moderately high.  

The second actuarial tool utilized by Dr. Buck was the MnSost-R, which contains 16 factors designed to predict the probability percentage of sexual recidivism.  Using the MnSost-R, Dr. Buck determined that there was a 92% probability that respondent would reoffend.

On cross-examination, Dr. Buck admitted that the risk factors listed in Dr. Hanson's meta-analysis in 1996 had changed due to more research and studies in 1998.  In 1996, Dr. Hanson found that factors such as low self-esteem, anger, denial, and general life stress did not impact the rate of recidivism.  Dr. Buck explained that the reason she used these factors to evaluate respondent was that the 1996 study was out of date in some aspects and that Dr. Hanson had changed his mind about a number of things since that time.   

When asked why she did not utilize the RRASOR, Dr. Buck responded that Dr. Hanson, who had created the instrument, now discouraged its use.  She further testified that she could not, in good faith, apply a four-item test to predict recidivism.  Dr. Buck also testified that she considered the MnSost-R to be more reliable than the RRASOR.  She stated that "that's what makes this field exciting because you have folks duking it out over the subtleties."  

Based on her clinical opinion, her experience, her clinical judgment, plus the actuarial tools, Dr. Buck opined that respondent was dangerous due to mental disorders making it substantially probable that he would commit future acts of sexual violence.

The State also called Dr. Paul Heaton, a private practitioner whose professional group did psychological evaluations for the DHS in similar cases.  Dr. Heaton determined that respondent's IQ was in the high to superior range.  He also concluded that respondent had a pattern of chronic psychic maladjustment, including severe defensiveness, suspicion, insecurity, evasiveness, and narcissistic personality traits.  Dr. Heaton found that respondent was in strong denial of wrongdoing and had little empathy for the victim.  Dr. Heaton's diagnosis matched that of Dr. Buck, and he also noted that respondent had not participated in any treatment program.  Dr. Heaton opined that respondent's mental disorders predisposed him to commit more acts of sexual violence.

In forming his assessment, Dr. Heaton utilized the MnSost-R and the RRASOR
.  Dr. Heaton explained that actuarial tools were screening devices that a layperson could use without advanced training or special licensing.  These instruments could also be used without any personal interview with the subject.  Dr. Heaton stated that the RRASOR was a very quick way of assessing a person's potential for reoffense with only four factors.  Dr. Heaton also stated that he had some concern over the limited nature of the tool since several factors had now been added to it.  Using the RRASOR, Dr. Heaton scored respondent a four, which indicated that there was a 33% probability that respondent would reoffend.  

Dr. Heaton also utilized the MnSost-R when it became available because he wanted to make sure that the results that he had obtained from the RRASOR had not changed significantly due to new information in the field.  According to Dr. Heaton, the MnSost-R had been cross-validated and was considered a state-of-the-art study.  Dr. Heaton scored respondent a 16 on the MnSost-R, which put him in the high risk category.  

Dr. Heaton stated that he would never rely on actuarial studies alone and that they were a way to support or corroborate the information obtained through other means.  Based on his interview with respondent, his professional experience and education, as well as the actuarial tools,  Dr. Heaton opined that respondent's mental disorders made it substantially probable that he would reoffend. 

Defense witness Dr. Timothy Brown, a clinical psychologist and director of the Kane County Diagnostic Center, reviewed the reports of Drs. Buck and Heaton and diagnosed respondent as suffering from paraphilia not otherwise specified
 and an adult antisocial behavior disorder.  Dr. Brown testified that respondent did not accept full responsibility for his criminal acts.  While Dr. Brown concluded that there was no substantial probability that respondent would reoffend as a result of his mental disorders, he acknowledged that he was not experienced in performing risk assessments under the Act.  Dr. Brown also admitted that he did not access all of the information reviewed by Drs. Buck and Heaton.  Dr. Brown opined that respondent posed a moderate risk to reoffend.

Dr. Brown utilized the MnSost-R
 and the RRASOR in order to assess respondent.  Using the MnSost-R, Dr. Brown determined that there was a 42% probability that respondent would reoffend, putting him in the moderate risk category.  
Using the RRASOR, Dr. Brown scored respondent a four, which indicated that there was a 33% probability that respondent would reoffend.   

Dr. Brown testified that there was controversy within the field regarding the use of actuarial tools to predict sexual recidivism.  Dr. Brown stated that they were not tests but research instruments, meaning that there were no manuals to accompany them.  Dr. Brown further stated that, although they could be used to buttress testimony, they could not definitively determine whether a person should be committed under the Act.         

On October 16, 2000, respondent was found to be a sexually violent person under the Act
.  Following a dispositional hearing on July 18, 2001, the court ordered that respondent be released based upon compliance with numerous conditions.  Respondent filed a timely notice of appeal.

II.  ANALYSIS

A.  Constitutionality of Act

Respondent first argues that the Act is unconstitutional because it is contrary to the due process standard established by the Supreme Court in 
Crane
.  Specifically, respondent contends that the Act is unconstitutional because it allows the civil commitment of a person as sexually violent without a finding that the person lacks control over his or her behavior.  Respondent relies on the language in 
Crane
, which states that "there must be proof of serious difficulty in controlling behavior."  
Crane
, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. 

Before 
Crane
, in 
Kansas v. Hendricks
, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997)
, the Supreme Court made clear that due process requires at least two findings to be made before a sex offender may be committed under a civil commitment statute: a finding of dangerousness linked with the existence of a mental illness or mental abnormality.  
Hendricks
, 521 U.S. at 358, 138 L. Ed. 2d at 512-13, 117 S. Ct. at 2080.  
In 
Crane
, the Supreme Court then stated that there "must be proof of serious difficulty in controlling behavior."  
Crane
, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.  While the Court
 
stated that "
Hendricks
 set forth no requirement of 
total
 or 
complete
 lack of control," the Court made it clear that the Constitution does not permit commitment "without 
any
 lack-of-control determination."  (Emphasis in original.)  
Crane
, 534 U.S. at 411-12, 151 L. Ed. 2d at 861-62, 122 S. Ct. at 870.

In our initial opinion, we noted that the 
question necessarily raised by 
Crane
 is whether a specific finding is required regarding a person's ability to control his or her sexually violent conduct.  We additionally noted that the case relied upon by the State, 
In re Detention of Varner
, 198 Ill. 2d 78, 84-85 (2001), which upheld the constitutionality of the Act, was not settled law.  At the time our opinion was issued, the United States Supreme Court had issued an order vacating our supreme court's judgment and remanding the cause for further consideration in light of 
Crane
.  See 
Varner v. Illinois
, 537 U.S. 802, 154 L. Ed. 2d 3, 123 S. Ct. 69 (2002
).  
As a result, when we issued our
 
opinion, it was unclear how 
Crane
 would be interpreted by our supreme court. 
     
      

Despite the uncertainty of 
Varner
, we found the Act constitutional as applied to respondent.  We reasoned that, even if 
Crane
 were interpreted to require a specific determination regarding a lack of control, such a finding was made in the case before us.
(footnote: 1)  Thus, it was not necessary for this court to consider whether the Act was constitutional on its face.  See 
Trent v. Winningham
, 172 Ill. 2d 420, 425 (1996) (
a court is not to compromise the stability of the legal system by declaring legislation unconstitutional when the particular case does not require it).  
This is true because existing legislation enjoys a presumption of constitutional validity, and courts operate only in the context of resolving lawsuits.  
Winningham
, 172 Ill. 2d at 425-26. 

After our opinion was issued, 
Varner
 was decided.  See 
People v. Varner
, 207 Ill. 2d 425, 432 (2003).  According to the supreme court, 
Crane
 did not hold that the Constitution requires a specific determination by the fact finder in every case that a person lacks volitional control.  
Varner
, 207 Ill. 2d at 432.  The court explained that, because the Act already contains definitions that supply the constitutionally required elements for civil commitment, a fact finder properly instructed with these definitions need not receive additional separate instruction on lack of control.  
Varner
, 207 Ill. 2d at 432-33.  
Specifically, the jury in 
Varner
 was instructed that a " ' "sexually violent person means a person who has been convicted of a sexually violent offense and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage
 
in acts
 
of sexual violence." ' "  
Varner
, 207 Ill. 2d at 428, quoting 
Varner
, 198 Ill. 2d at 82; 725 ILCS
 
207/5(f) (West 1998).  In addition, the jury was instructed that a "mental disorder" is a " ' "congenital or acquired condition 
affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence
." ' "  (Emphasis added.)  
Varner
, 207 Ill. 2d at 428, quoting 
Varner
, 198 Ill. 2d at 82
, quoting 725 ILCS 207/5(b) (West 1998).  Given these instructions, there was no need for the jury in 
Varner
 to make any additional findings regarding the respondent's ability to control his sexually violent conduct.  
Varner
, 207 Ill. 2d at 429.    

In this case, the trial court found respondent to be a "sexually violent person" as defined in the Act.  In its written order, the court noted that respondent had been diagnosed with paraphilia not otherwise specified, alcohol abuse, and antisocial personality disorder.  Based on the expert testimony, the court concluded that respondent suffered from mental disorders that made it substantially probable that he would engage in acts of sexual violence.  In light of 
Varner
, these findings alone were sufficient to satisfy 
Crane
.  See 
People v. Swanson
, 335 Ill. App. 3d 117, 122-23 (2002) (to find a respondent sexually dangerous, the trier of fact must find that the respondent was dangerous because he suffered from a mental disorder that made it substantially probable that he would engage in further acts of sexual abuse; consequently, there was no need for the finder of fact to make additional findings regarding the respondent's ability to control his conduct).  

Nevertheless, as previously mentioned, the trial court also made a specific finding that respondent was unable 
to control his sexually violent conduct.  In particular, the court found "from considering all of the testimony, including that which established Respondent's refusal to undergo treatment, his denial of self blame, his placing blame on the victim, and the nature of his mental illness, that he is not able to control his sexual conduct in an unstructured environment."  As a result, the court in this case actually went beyond what 
Varner
 has interpreted 
Crane
 to require.  Thus, 
we
 
find no due process violation, and respondent's constitutional challenge to the Act necessarily fails.
 

B.  Evidence of Lack of Control

Respondent's second argument is that the evidence does not support a finding that he lacked the ability to control his sexually violent behavior as required under 
Crane
.  "On review, we ask only whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could find that the elements of the offense have been proved beyond a reasonable doubt."  
In re Detention of Tittlebach
, 324 Ill. App. 3d 6, 11 (2001).      

Respondent initially argues that there is no evidence in the record to show that he has serious difficulty in controlling his behavior
.  Respondent bases this argument on the testimony of 
Drs. Buck and Heaton that respondent committed these offenses with volition.  Respondent apparently takes the position that because he committed these acts with volition, the State has not proved that he lacks control over his sexually violent behavior.  For the following reasons, we find this argument to be without merit. 

As we have stated, 
the trial court specifically found that respondent was not able to control his sexual conduct in an unstructured environment.  The court based its finding on the expert testimony regarding respondent's refusal to undergo treatment, his denial of self-blame, his placing blame on the victim, and the nature of his mental illness. 

Indeed, three experts testified as to respondent's mental disorders and risk of reoffending.  Specifically, 
State expert Dr. Buck testified that respondent showed no remorse for his criminal conduct, failed to accept blame for it, and transferred blame instead to the victim.  Dr. Buck also found that respondent suffered from paraphilia not otherwise specified, alcohol abuse, and severe antisocial personality disorder, with narcissistic features.  Applying her findings of respondent's traits to actuarial studies, Dr. Buck found respondent to be at a high risk to reoffend.  In sum, Dr. Buck opined that, to a reasonable degree of psychological certainty, respondent was dangerous due to mental disorders making it substantially probable that he would commit future acts of sexual violence.

Consistent with Dr. Buck's findings, State expert Dr. Heaton found that respondent was in strong denial of wrongdoing and had little empathy for the victim.  Dr. Heaton's diagnosis matched that of Dr. Buck, and Dr. Heaton noted that respondent had not participated in any treatment program.  Dr. Heaton testified that, to a reasonable degree of psychological certainty, respondent's mental disorders rendered it substantially probable that he would reoffend and commit further acts of sexual violence.

Finally, defense expert Dr. Brown diagnosed respondent as suffering from paraphilia not otherwise specified
 and adult antisocial behavior.  While Dr. Brown concluded that there was no substantial probability that respondent would reoffend as a result of his mental disorders, he testified that respondent did not accept full responsibility for his criminal acts.  In addition, Dr. Brown acknowledged that he was not experienced in performing risk assessments under the Act and that he did not access all of the information reviewed by Drs. Buck and Heaton.  Dr. Brown concluded that respondent posed a moderate risk to reoffend.

In sum, all three experts agreed that respondent suffered from paraphilia not otherwise specified and posed a moderate to high risk to reoffend.  We find that this testimony, 
in conjunction with respondent's refusal to undergo treatment, his denial of self-blame, and his placing blame on the victim, established proof beyond a reasonable doubt that respondent lacked the ability to control his sexually violent behavior.

Moreover, testimony that respondent committed these acts of sexual violence with volition does not prevent commitment under the Act.  If we were to adopt such a position, all persons subject to commitment would escape such a finding by declaring all of their past criminal conduct to be
 
volitional.  Under that view, commitment would result only when a person confessed to an inability to control his sexually violent behavior, as was the case in 
Hendricks
.  
Hendricks
, 521 U.S. at 360, 138 L. Ed. 2d at 514, 117 S. Ct at 2081.  
As 
Crane
 illustrates, the Constitution's safeguards of human liberty in the area of mental illness and the law are not best enforced through precise, bright-line rules.  
Crane
, 534 U.S. at 413, 151 L. Ed. 2d at 863, 122 S. Ct. at 870.  The Court explained:

"And we recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision.  It is enough to say that there must be proof of serious difficulty in controlling behavior.  And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case."  
Crane
, 534 U.S. at 413, 151 L. Ed. 2d at 862-63, 122 S. Ct. at 870.

For the reasons stated above, sufficient evidence exists to support the trial court's determination that respondent lacked control of his sexually violent behavior.

C.  Misstatement in Trial Court's Order
 
   

Respondent also asserts that, because the trial court incorrectly stated that he was diagnosed as a pedophile, his adjudication as a sexually violent person should be reversed.  We disagree.

"Parties are not entitled to error-free trials, but fair trials, free of substantial prejudice."  
Perry v. Murtagh
, 278 Ill. App. 3d 230, 240 (1996).  Not every error committed by the trial court in a civil case leads to reversal; rather, there must be some showing that the appellant has been prejudiced by that error, and reversal is required only where it appears that the outcome might have been different had the error not occurred.  
In re Marriage of Wilder
, 122 Ill. App. 3d 338, 344-45 (1983).  The
 
burden to establish prejudice
 is on the party seeking reversal.  
Goldstein v. Scott
, 108 Ill. App. 3d 867, 879 (1982).  

We do not believe that the misstatement of the trial court in this case warrants reversal.  As respondent concedes, in its initial written ruling on the "sexually violent person" petition, the trial court correctly referred to respondent's diagnosis as "paraphilia not otherwise specified."   In that ruling, the trial court made no mistake as to respondent's mental disorder, referring to it at all times as paraphilia.  It was not until the court's ruling on respondent's motion for a new trial that the court misstated respondent's diagnosis as pedophilia.  Therefore, the court relied on the correct diagnosis in its original ruling finding respondent to be a sexually violent person within the meaning of the Act. 
 
As a result, we do not believe that respondent was prejudiced or that the outcome might have been different had the trial court not made this misstatement.  See 
In re Estate of LaCasse
, 265 Ill. App. 3d 847, 854 (1994) (
where it appears that the error does not affect the outcome below, or where the court can see from the record that no injury has been done, the judgment will not be disturbed). 
 Because the misstatement did not deprive respondent of a fair trial, we will not reverse on this basis.

D.  Order Compelling DHS Evaluation

Respondent's next argument is that the trial court erred when it ordered him to submit to an evaluation by the DHS.  Respondent maintains that because this issue was raised in his posttrial motion, it was preserved for appellate review.  The State contends that this issue is waived because respondent did not object to the motion during the proceedings.

As a general rule in civil cases, the failure to specifically and timely object waives the objection for purposes of review.  
Rice v. Merchants National Bank
, 213 Ill. App. 3d 790, 798 (1991).  As respondent concedes, he did not object to the order compelling him to submit to a DHS evaluation at the time of the proceedings.  However, waiver is an admonition to the parties rather than a limitation on the reviewing court's jurisdiction, and it may be relaxed in order to maintain a uniform body of precedent or where the interests of justice so require.  
American Federation of State, County & Municipal Employees, Council 31 v. County of Cook
, 145 Ill. 2d 475, 480 (1991).  Given that respondent raised the issue in his posttrial motion and argues it at length on appeal, we find that the interests of justice require our review of this issue.

Respondent contends that the trial court erred by compelling him to submit to a DHS evaluation.  Specifically, respondent argues that the order (1) violated his right to remain silent pursuant to section 25(c)(2) of the Act (725 ILCS 207/25(c)(2) (West 1998)); and (2) was contrary to section 30(c) of the Act (725 ILCS 207/30(c) (West 1998)).  Because the resolution of both issues hinges upon the interpretation of the Act, our review is 
de novo
.  
Department of Public Aid ex rel. Davis v. Brewer
, 183 Ill. 2d 540, 554 (1998).
 

Section 25(c)(2) of the Act states:

"Except as provided in paragraph (b)(1) of Section 65 and Section 70 of this Act, at any hearing conducted under this Act, the person who is the subject of the petition has the right to:

***

(2) Remain silent."  725 ILCS 207/25(c)(2) (West 1998).

Although respondent argues that the evaluation compelled by the court violated his right to remain silent, this court has held that the right to remain silent applies only during any hearing held after the filing of a petition.  See 
In re Detention of Anders
, 304 Ill. App. 3d 117, 121 (1999).  It is clear that the legislature's use of the phrase "at any hearing" was meant to limit the scope of this protection to "hearings."  
Anders
, 304 Ill. App. 3d at 121.  Interpreting section 25 of the Act as affording a person the right to remain silent during an evaluation ignores the clear language of the statute.  
Anders
, 304 Ill. App. 3d at 121.  Therefore, we hold that the court's order compelling respondent to submit to an evaluation by the DHS did not violate respondent's right to remain silent under section 25(c)(2) of the Act.

Likewise, we reject the argument that respondent had the right to refuse to cooperate with the DHS evaluation under section 30(c) of the Act (725 ILCS 207/30(c) (West 1998)).  Section 30(c) states, in pertinent part:

"If the court determines after a hearing that there is probable cause to believe that the person named in the petition is a sexually violent person, the court shall order that the person be taken into custody if he or she is not in custody and shall order the person to be transferred within a reasonable time to an appropriate facility for an evaluation as to whether the person is a sexually violent person.  If the person named in the petition refuses to speak to, communicate with, or otherwise fails to cooperate with the expert from the Department of Human Services who is conducting the evaluation, the person shall be prohibited from introducing testimony or evidence from any expert or professional person who is retained or court appointed to conduct an evaluation of the person."  725 ILCS 207/30(c) (West 1998).

          Apparently, respondent interprets section 30(c) of the Act as giving a person the right to remain silent at evaluations.  We disagree
 
with this interpretation.  As the court stated in 
In re Detention of Tiney-Bey
, 302 Ill. App. 3d 396, 402 (1999), "a respondent has the power, but not the right, to refuse to comply with an evaluation."  Section 30(c) of the Act "merely addresses the practical problems that may arise because of this and does not imply a right to remain silent."  
Tiney-Bey
, 302 Ill. App. 3d at 402.

In a related argument, respondent contends that the ruling deprived him of a trial strategy, causing his trial to be unfair.  When the court granted the State's motion to compel respondent to submit to a DHS evaluation, the court also granted respondent's request for appointment of an expert.  Respondent, however, argues that had he been able to refuse cooperation with the DHS, and thereby forgo his own expert, the trial may have yielded a different outcome.  In support of his position, respondent relies on two cases decided by this court, 
In re Detention of Trevino
, 317 Ill. App. 3d 324 (2000), and 
In re Detention of Kortte
, 317 Ill. App. 3d 111 (2000). 

The intent of the statute is to prevent either the State or the respondent from having an evidentiary advantage and to guarantee that both parties have the opportunity to present evidence substantially equal in character.  
Trevino
, 317 Ill. App. 3d at 330.  In 
Kortte
, we concluded that the respondent was denied a level playing field because the State had the opportunity to call two nonexamining expert witnesses, while the respondent was barred from calling a nonexamining expert of his own.  Similarly, in 
Trevino
, we held that the respondent's right to due process was violated because the State was able to present one examining and one nonexamining expert witness, while the respondent was able to present only one nonexamining expert.  
Trevino
, 317 Ill. App. at 331.   Contrary to respondent's assertion, the circumstances in 
Kortte
 and 
Trevino
 are not present here.  As respondent concedes, the court granted his request for appointment of an expert.  As a result, the State was able to present two examining expert witnesses and respondent was able to present one examining expert witness.  Because both sides were able to call examining experts, neither party had an evidentiary advantage and both parties had the opportunity to present evidence substantially equal in character.  Therefore, the court's application of section 30(c) in this case did not deny respondent due process.

E.  Admission of Actuarial Risk Assessment

Respondent's final argument, raised in a supplemental brief, is that it was error to allow expert testimony regarding certain actuarial instruments utilized to predict the likelihood that respondent would reoffend.  Specifically, respondent maintains that the Static 99, the MnSost-R, and the RRASOR
 fail the test for admissibility as articulated in 
Frye
.  As support, respondent cites a case decided by this court, 
People v. Taylor
, 335 Ill. App. 3d 965, 976 (2002),
 which held that psychological or psychiatric testimony of an expert predicated upon actuarial instruments is scientific evidence subject to 
Frye
.  
The State maintains that respondent waived this issue because he never objected to the experts' testimony at trial or in a posttrial motion.  Respondent, however, asserts that this issue should be considered under the doctrine of plain error. 

The plain error analysis applies where the respondent has failed to make a timely objection.  
People v. Thurow
, 203 Ill. 2d 352, 363 (2003).  In this situation, it is the respondent 
 rather than the State who bears the burden of persuasion with respect to prejudice.  
Thurow
, 203 Ill. 2d at 363.  
Plain error is a limited and narrow exception to the general waiver rule, and is invoked only where the evidence is closely balanced, or where the alleged error is so substantial that it deprived the respondent of a fair trial.  
People v. Kuntu
, 196 Ill. 2d 105, 128 (2001).

In our initial opinion, with one justice dissenting, 
we concluded that plain error had occurred in this case.  Specifically, we noted that all three experts testified that they relied, at least in part, on the Static 99, the MnSost-R, and the RRASOR in finding respondent to be a sexually violent person.  However, there was no determination under 
Frye
 regarding the general acceptance of using these actuarial tools to measure the likelihood of reoffense
.

Illinois courts follow the 
Frye
 test in determining the admissibility of expert testimony based on novel scientific evidence.  
Frye
, 293 F. 1013; 
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 77 (2002).
  
The "general acceptance" test articulated in 
Frye
 provides that scientific evidence is admissible only if the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs.  
Frye
, 293 F. at 1014; 
Donaldson
, 199 Ill. 2d at 77 (2002).  In determining what constitutes "general acceptance," the question is whether there is consensus versus controversy over a particular technique.  
Taylor
, 335 Ill. App. 3d at 977, citing 
Donaldson
, 199 Ill. 2d at 78.
  

In 
Taylor
, we noted that several Illinois courts have held that 
Frye
 should govern the admissibility of psychological and psychiatric expert testimony that is not predicated solely on the evaluator's own clinical observation and experience.  
Taylor
, 335 Ill. App. 3d at 973.
  Consequently, we held that the State is obligated to satisfy the 
Frye
 test before an expert's testimony predicated upon actuarial instruments is admitted.  
Taylor
, 335 Ill. App. 3d at 973.  Specifically, 
Taylor
 found that the Static 99, the MnSost-R, and the RRASOR constitute scientific evidence subject to the 
Frye
 test.  
Taylor
, 335 Ill. App. 3d at 973. 

  
Relying on 
Taylor
, we originally remanded this case to the trial court to conduct a 
Frye
 hearing.  We stated that if these actuarial tools satisfied the standard set forth in 
Frye
, then the judgment of the trial court would be affirmed.  If, however, the State failed to meet its burden to show that the Static 99, the MnSost-R, and the RRASOR had gained general acceptance from the psychological and psychiatric communities, then the judgment of the trial court would be reversed and respondent would be entitled to a new trial. 
 
 
 

However, our previous opinion
, along with 
Taylor
, has been ordered vacated by our supreme court.  In particular, we are instructed to reconsider our decision in light of 
Simons
, where the supreme court addressed whether actuarial risk assessment evidence is admissible under 
Frye
.  
Simons
, 213 Ill. 2d at 533.  In 
Simons
, the respondent was found to be a sexually violent person under the Act.  
Simons
, 213 Ill. 2d at 524.  As in the case at bar, State experts Drs. Buck and Heaton used a variety of actuarial risk assessment instruments, including the Static 99, the MnSOST-R, the Violent Risk Assessment Guide (VRAG), and the Sex Offender Risk Assessment Guide (SORAG)
.  
Simons
, 213 Ill. 2d at 527.  On appeal, the respondent argued that actuarial risk assessment is a novel scientific methodology that has yet to gain general acceptance in the psychological and psychiatric communities, and that any expert testimony based upon actuarial risk assessment must be excluded under 
Frye
.  
Simons
, 213 Ill. 2d at 525-26.  
The State countered that actuarial principles are not the least bit novel and therefore are not subject to 
Frye
.  Alternatively, the State argued that, even if the particular actuarial instruments are novel, they have gained general acceptance in the relevant psychological and psychiatric communities.  
Simons
, 213 Ill. 2d at 526.  Relying on 
Taylor
, the appellate court agreed with the respondent, and the supreme court allowed the State's petition for leave to appeal.  
Simons
, 213 Ill. 2d at 529. 
  

After noting that appellate courts were divided on this question,
(footnote: 2) the supreme court held that 
"whether or not actuarial risk assessment is subject to 
Frye
, there is no question that it is generally accepted by professionals who assess sexually violent offenders and therefore is perfectly admissible in a court of law."  
Simons
, 213 Ill. 2d at 535.  The court reasoned that (1) experts in at least 19 other states rely upon actuarial risk assessment in forming their opinions on sex offenders' risks of recidivism; (2) no state outside of Illinois has deemed inadmissible expert testimony based upon such instruments; (3) several jurisdictions actually mandate actuarial risk assessment; and (4) academic literature contains many articles confirming the general acceptance of actuarial risk assessment by professionals who assess sexually violent
 
offenders for risk of recidivism.  
Simons
, 213 Ill. 2d at
 
535,
 
539-41.  In the court's view, the case law, the statutory law, and the academic literature all support the conclusion that actuarial risk assessment has gained general acceptance in the psychological and psychiatric communities.
(footnote: 3)  
Simons
, 213 Ill. 2d at 543.  Thus, it was proper for the trial court to admit the expert testimony of Drs. Buck and Heaton, which relied in part upon actuarial assessment.  
Simon
, 213 Ill. 2d at 543.      

In the case at bar, 
all three experts relied in part on actuarial instruments to predict respondent's likelihood of reoffense
.  In particular, State experts Drs. Buck and Heaton utilized the Static 99, the MnSost-R, and the RRASOR to help form their opinions that respondent was a sexually violent person.  In light of our supreme court's decision in 
Simons
, 
holding that actuarial risk assessment has gained general acceptance in the psychological and psychiatric communities 
and is therefore admissible
, the trial court properly admitted the expert testimony of Drs. Buck and Heaton.

III.  CONCLUSION       

For the reasons stated, the judgment of the circuit court of Kane County is affirmed. 

Affirmed.

HUTCHINSON and KAPALA, JJ., concur.  
 

FOOTNOTES
1: 
In its written ruling on the "sexually violent" petition, the trial court made an explicit finding that respondent was not able 
to control his sexually violent conduct in an unstructured environment.

2: 
The Appellate Court, Fourth District, took the opposite view of 
Taylor
 in 
In re Detention of Erbe
, 344 Ill. App. 3d 350 (2003), holding that (1) actuarial risk assessment is not a novel scientific method subject to 
Frye
, and (2) even if it is, it meets the general acceptance test.  
Simons
, 213 Ill. 2d at 534.

3: 
We also note that the supreme court in 
Simons
 adopted a dual standard of review with respect to the trial court's admission of expert scientific testimony
.  
Simons
, 213 Ill. 2d at 530.  Specifically, the "decision as to whether an expert scientific witness is qualified to testify in a subject area, and whether the proffered testimony is relevant in a particular case, remains in the sound discretion of the trial court.  The trial court's 
Frye
 analysis, however, is now subject to 
de novo
 review."  
Simons
, 213 Ill. 2d at 530-31.